# EXHIBIT A

Kyle W. Roche (*pro hac vice*)
Edward Normand (*pro hac vice*)
Ivy T. Ngo (SBN 249860)
Daniel M. Stone (*pro hac vice*)
ROCHE CYRULNIK FREEDMAN LLP
99 Park Avenue, 19th Floor
New York, NY 10016

Katherine Eskovitz (SBN 255105)
ROCHE CYRULNIK FREEDMAN LLP
1158 26th Street No. 175
Santa Monica, CA 90403

*Counsel for Plaintiff, Mark Shin*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARK SHIN,<br><br>                    Plaintiff,<br><br>          v.<br><br>ICON FOUNDATION,<br><br>                    Defendant. | No. 3:20-cv-07363<br><br>**AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

        Mark Shin brings this action against ICON Foundation ("ICON") and alleges as follows, based on his personal knowledge and on information and belief:

                                        **INTRODUCTION**

        1.        This action concerns the property rights related to the crypto-asset "ICX" and the methods by which it is issued on the ICON blockchain.

        2.        A fundamental feature of a typical crypto-asset is its decentralized nature—meaning, in the case of true decentralization, that whoever launched the crypto-assets should not have effective control of their subsequent proliferation, transferability, use, value, or ownership.

Since the creator of bitcoin released the framework for bitcoin in 2008, thousands of individuals and entities have launched their own crypto-assets, leveraging the enthusiasm for a decentralized form of money that bitcoin generated.

3.      In order to achieve decentralization, crypto-assets and the entities that launch them rely on a network of independently operated "nodes" to review and implement software (or "code"). The underlying code enforces the rules that the users of a crypto-asset implicitly agree, resulting in a network for the crypto-assets. In this way, the community controls the code, and the code dictates the value of the units of the crypto-asset, usually called "tokens."

4.      In this case, ICON designed and issued "ICX" tokens and designed a software protocol by which users could earn them and that ICON touted as decentralized. Shin began to use this protocol to earn ICX tokens.

5.      On August 22, 2020, shortly after ICON released a major software update to the rules governing the ICON network, and after having already earned hundreds of thousands of ICX tokens, Shin inadvertently discovered a bug in the software that allowed him to generate approximately 14 million new ICX tokens. Shin did not hack into any network, or modify any source code in which any software was written, or exceed the authorization that the ICON network affords to all of its users, or break any applicable rules.

6.      Shin simply recognized that when he undertook a particular task on the network, the result was the generation of new ICX tokens into his ICX account, or "wallet," and so he continued to undertake that task and generate ICX tokens. If a slot-machine keeps paying out with every pull of the lever, barring any casino rule to the contrary, the player is entitled to keep pulling the lever. The ICON network had no such rules, either express or implied.

7.      Whatever ICON's intent in releasing an update with this feature, the community of ICX users adopted and implemented it. Indeed, other ICX token owners used this feature to generate approximately 6 million additional tokens, and those owners have enjoyed the free and uninterrupted use of those tokens. Shin has not.

8.      ICON needed a scapegoat. Seeking to distract from their culpability—their failure to check the code they had written—ICON went on the offensive against Shin. In a public statement, ICON defamed Shin by declaring that he was a "Malicious Attacker" and that he had acquired "stolen" funds.

9.      In the same public statement, and now ignoring the supposed decentralization it had touted, ICON wrongly claimed that it had been "able to recover the majority of the stolen funds." It had not. Instead, ICON released yet another version of the ICON protocol that targeted *all* of Shin's ICX tokens and programmatically locked them from being used.

10.      In a further act of centralized control, ICON then reached out to certain crypto-asset exchanges, defamed Shin to them as they had defamed him to the public, and demanded that they freeze Shin's accounts—even those accounts that were not related to ICX. The exchanges relied on ICON's defamatory statements and complied.

11.      In a blatant exercise in intimidation, ICON then contacted Shin on Twitter and threatened him with criminal prosecution if he did not work with them to return the ICX tokens. He declined, because ICON has no property interest in any of his ICX tokens.

12.      In sharp contrast to its mistreatment of Shin, ICON has not interfered with any of the other users who generated 6 million tokens just as Shin had.

13.      ICON thus maliciously and purposefully interfered with Shin's rights to use and enjoy digital assets that he lawfully acquired as his property. Shin therefore brings this action to

vindicate his rights as the owner of the ICX tokens that he earned before August 22, 2020, and that he generated on that date.

## PARTIES

14.     Shin is a resident of Denver, Colorado.

15.     ICON is a Swiss foundation with its principal place of business in Zug, Switzerland, and with offices in San Francisco, California. ICON issued the whitepaper that explains the ICON protocol and informs its ongoing operation. ICON's mistreatment of Shin, described further below, indicates that ICON is in control of the supposedly decentralized network.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a), because Shin is a citizen of Colorado and ICON is a citizen of Switzerland, and the matter in controversy exceeds the value of $75,000.

17.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Shin's claims occurred, and a substantial part of property that is the subject of this action is situated, in this District.

18.     This Court has personal jurisdiction over ICON pursuant to Cal. Code Civ. Pro § 410.10 and Federal Rule of Civil Procedure 4(k).  ICON transacted business and maintained substantial contacts in this District.  ICON has purposefully availed itself of the benefits of conducting business in California because a number of its chief employees, including its Founder and CEO, are based in California.  This Court also has personal jurisdiction over ICON because ICO has filed a motion to dismiss under Federal Rule of Civil Procedure 12 without raising lack of personal jurisdiction as a defense.

**FACTUAL ALLEGATIONS**

**A. Background – Crypto-Assets**

**i.  Bitcoin: The First Crypto-Asset**

19.     Crypto-assets are digital assets that use a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify their transfer.

20.     Bitcoin was the world's first major crypto-asset.[1] It is also the largest and most popular crypto-asset, with a market cap of more than $750 billion. Bitcoin spawned a market of crypto-assets that, together with bitcoin, have a current market cap of more than $1 trillion.

21.     The core feature of Bitcoin—and nearly every other crypto-asset—is a ledger that tracks the ownership and transfer of bitcoin in existence. This ledger is called the blockchain.

22.     Each Bitcoin user has a digital "address" used to receive bitcoin. The Bitcoin blockchain lists, publicly, every address and the number of bitcoin associated with that address. The blockchain shows every bitcoin transaction in which that address has engaged.

23.     By providing a full transaction history of each bitcoin, the blockchain allows for the secure exchange of all bitcoin. Any attempt to duplicate a bitcoin or to transfer it to multiple people at once would be futile, because a Bitcoin user could use the blockchain to verify each transaction involving that bitcoin. There is thus no effective way to counterfeit bitcoin.

**ii.  The Diversification of Crypto-Assets**

24.     Since the creation of Bitcoin, the number and types of distinct crypto-assets have grown dramatically. In April 2013, there were only seven crypto-assets listed on

---

[1] The term "bitcoin" can refer to both a computer protocol and a unit of exchange. Accepted practice is to use the term "Bitcoin" to label the protocol, software, and community, and the term "bitcoin" to label the units of exchange.

coinmartketcap.com, a popular website that tracks the crypto-asset markets. As of this filing, that site monitors more than 8,000 crypto-assets.

25.    The creators of different crypto-assets have decided, in many instances, to deviate from core features of Bitcoin, creating crypto-assets that work in numerous different ways and serve numerous different purposes and markets.

26.    These cryptocurrencies generally distinguish themselves through different iterations of similar features: a degree of decentralized governance (*i.e.*, no central authority dictates which transactions are authorized); a degree of supply management (*i.e.*, the community understands in what circumstances additional tokens will be generated and to whom they will be given); and a blockchain.

27.    The method by which crypto-assets are issued and distributed varies.

28.    While many blockchain networks supporting some crypto-assets are technologically, economically, and socially designed and structured to be decentralized, many networks, including the ICON blockchain network, are effectively controlled by a centralized team of presumably trustworthy actors that coordinate, facilitate, and ensure decision-making consistent with the centralized team's goals.

29.    Bitcoin maintains its blockchain and provides for new bitcoin to enter the economy through a consensus mechanism known as "mining," or "proof of work." Individuals "mine" bitcoin by having sophisticated computer programs perform complex, resource-intensive automated verifications of past transactions, which are then added to the blockchain. Those who mine bitcoin—"miners"—are rewarded with new bitcoin.

30.    Since the invention of bitcoin, other crypto-assets have adopted approaches other than mining for ensuring a controlled supply. In particular, some crypto-assets now use a

consensus mechanism called "proof of stake," which provides new currency to those who own the most of that currency instead of those who expend significant electrical resources mining.

31.     Under the proof-of-stake consensus mechanism, individuals must "stake" their crypto-assets to be eligible to receive newly minted tokens. Issuers of some crypto-assets impose rules on staking, such as (1) requiring minimum amounts; (2) imposing a minimum staking period; and (3) imposing requirements on when an individual can "unstake" their tokens.

32.     ICX tokens are issued through a proof-of-stake consensus mechanism.

### iii.   How Crypto-Assets Are Transferred and Exchanged

33.     Unlike in traditional banks, where each customer has a bank account and is identified as the owner, control of crypto-assets is attested primarily through control of cryptographic keys. These cryptographic keys have two components: a public key and a private key. This cryptographic system of transfer and exchange is generally the same across most crypto-assets, including bitcoin and ICX.

34.     With respect to Bitcoin, for example, the public key is used to produce the bitcoin address. A bitcoin address is a destination for transfers of bitcoin, like the account number of a conventional bank account. Bitcoin addresses are long strings of alphanumeric text, often abbreviated by a small group of numbers and letters appearing in the string, such as 1s5F or R3w9.

35.     A private key allows the owner of a bitcoin address to access it, like a long PIN or password for a conventional bank account.

36.     Those who wish to transfer bitcoin need to know the recipient's bitcoin address, just as one transferring funds to a conventional bank account needs to know the account number for that account. When they have the recipient's address, transferors can use their private keys to authorize the transfer of bitcoin, just as one would use a PIN or password to authorize a transfer between traditional bank accounts.

37.     A transfer of bitcoin is public to the extent that anyone can see the transferor's bitcoin address, the recipient's bitcoin address, and the quantity of assets transferred. That is, anyone could see that bitcoin address 1s5F transferred 10.3 bitcoin to bitcoin address R3w9. The names of the individuals or entities that control these addresses, on the other hand, are private.

38.     Crypto-exchanges emerged to enable smoother and faster trading between individuals, just as stock and commodities exchanges emerged to enable easy trading of securities among counterparties who never meet.

39.     When a customer wishes to trade crypto-assets on an exchange, she must first create an account on that exchange. The exchange will then provide that customer with a deposit address that the exchange controls. When the customer deposits crypto-assets into that deposit address, the exchange will credit her trading account with the corresponding crypto-asset. The exchange will typically then transfer the crypto-assets into one of its other addresses for storage.

40.     When a customer with an existing account wishes to transfer more crypto-assets into an exchange to use in future trades, she must ask the exchange for a deposit address. This destination address is often different each time the customer makes a transfer, meaning that one cannot easily trace transactions belonging to a particular individual.

41.     This process is similar to the process used by a customer transferring funds to an online account with a stockbroker like Charles Schwab or E-Trade. Such a customer wires funds from her personal bank account to an account controlled by the broker, for which she has a PIN and password. The broker credits her with an equivalent amount of funds on its trading platform and places the funds it received into its reserve.

42.     When a customer wants to withdraw a crypto-asset from an exchange, she tells the exchange the address into which she would like her crypto-assets transferred. The exchange then

debits the user's account and transfers a corresponding amount of crypto-asset from the exchange's reserves to that address.

### iv.   How Crypto-Asset Software Is Updated

43.     The rules governing crypto-asset networks, like many software applications, sometimes need to be updated. When an individual is prompted to update her digital banking app on her smartphone, she probably doesn't think twice. Smartphone applications often auto-update without the user noticing. Software updates are often necessary processes—if you fail to install the latest version of the software, you run the risk of being denied access to its services.

44.     This process is more complicated for crypto-assets, because typically there is no centralized authority responsible for releasing software updates. Accordingly, for crypto-assets, software updates occur in the form of what is called a "software fork."

45.     Crypto-asset networks are governed by different rules concerning how software forks get adopted across the entire network. For many, software forks get implemented through a voting mechanism from "full node users." A node, in the world of crypto-assets, is a computer that connects to a crypto-asset network. "Full nodes" enforce all of the rules of the network (whereas "lightweight" nodes provide for ease of use of the network).

46.     Full node users validate, send, and receive transactions and maintain a copy of the blockchain they are operating. Many people and organizations volunteer to run full nodes using spare computing and bandwidth resources. For many blockchains, full node users have the opportunity to vote on and accept software forks.

47.     Bitcoin has many thousands of full nodes. And anytime developers seek to propose a new update to the bitcoin network, anyone who runs a full node may choose to either accept or reject the proposed changes.

**B.  ICON and the ICX Token**

48.     ICON was founded by Dayli Financial Group, a Korean Fintech company valued at $4 billion that also owns the popular Korean exchange Coinone. On August 1, 2017, ICON issued its first draft whitepaper, which outlined the conceptual framework of the ICON protocol. It issued the final whitepaper in January 2018. (Attached as Exhibit 1.)

49.     The ICON whitepaper stated that ICON "essentially aims for decentralized governance." ICON designed ICX to create a decentralized token that would "eradicate boundaries that have been existed [sic] in the centralized system." The benefit of this decentralized system, ICON claimed, was that "[t]ransactions on the ICON Network are verified by a ledger shared within the community network itself, *not controlled by a centralized authority*." (emphasis added).

50.     To achieve this promised decentralization, ICON incentivized its users to run full nodes that themselves were comprised of community Public Representatives ("P-Reps"). The P-Reps, as explained further below, can change the policies of the various nodes or communities of which they are part. Through their voting power, P-Reps determine when to update the code underlying the ICON network and help contribute to the overall ICON ecosystem by developing new apps or new features for the code.

51.     ICX was designed as a proof-of-stake crypto-asset, where users stake their ICX tokens towards other P-Reps. Each ICX token is worth one vote, and thus ICX owners can "vote" for other users to become P-Reps. Those Reps then set policies for the overall ICX platform. Users can also transfer their delegated tokens from one P-Rep to another P-Rep.

52.     Staking is not costless. Staking an ICX token removes it from circulation. This mechanism gives those with the most ICX tokens more control over the network, but it requires them to have a stake in that network.

53.     Staked ICX can be unstaked, allowing it to be transferred again, but the ICON network requires time to process the unstaking request. In order to transfer staked ICX, a user must unstake them, a process that takes between five to twenty days. The unstaking period is determined by the total amount of staked ICX in the entire system.

54.     Staking ICX thus has a significant opportunity cost.  In order to compensate staked users for this cost, the ICON protocol provides staked ICX holders with newly generated ICX at certain intervals.  To be clear, this newly generated ICX is not transferred from ICON or another user.  It is generated at the time it is issued directly to the staked ICX holder.

55.     This system encourages users to engage with the ICON protocol and develop it, because those who do so will be rewarded with additional ICX.

56.     At the same time, because the ICON blockchain is supposed to consist of no centralized authority, the system also includes penalties to discourage hacking or interrupting service. Users who seek to disrupt the ledger-verification process are subject to the ecosystem automatically destroying a portion of their staked ICX. This process, like all other ICON processes, is supposedly decentralized, without ICON or any other central authority controlling it.

**C.  Shin Acquires ICX Tokens**

57.     Shin became interested in the ICON network towards 2017.

58.     From the end 2017 through the time of this filing, Shin purchased more than 250,000 ICX tokens.  As of August 22, 2020, he had staked more than 150,000 ICX tokens.

59.     Shin acquired his ICX tokens on the popular crypto-exchanges Binance, Kraken, and Velic.

60.     In the course of acquiring these ICX tokens, Shin never agreed to any terms of service or any other contract with ICON.

**D.  ICON Releases the Revision 9 Network Proposal**

61.     Like other crypto-assets, ICON updates its code through the use of software forks. ICON refers to its software forks as "network proposals."

62.     In August 2020, ICON published a network proposal to the ICON network, the "Revision 9 Proposal." The ICON website included a summary of the changes contemplated by the proposal:

## Revision 9 Proposal

The ICON Foundation submit a Network Proposal (Revision Proposal) to activate the Revision 9 feature. This Revision 9 is already included in Loopchain 2.6.0, ICON Service 1.7.3, and Reward calculator 1.2.0 but is not yet activated. The purpose of the proposal is to enhance the governance experience of the ICON Network. Below are the summary of the update. You can find a release note for this update at the link (https://www.icondev.io/changelog/release-note)

### Summary of this update

- Add a Private Key Dualization feature so that a P-Rep can separate the key used for block production from the key used for governance. The existing key will be used as governance keys, and P-Reps can register additional node key for block production going forward
- Add a Multiple Unstaking Requests function so that a user can create multiple unstaking requests and manage it
- Support a SCORE inter-call function to interact with System SCORE so that a smart contract can stake and delegate with IISS API using SCORE internal call
- Add a new type of the network proposal to adjust the global i_rep value
- The number of delegation slots has increased up to 100
- Minor bugfix and code optimization

63.      On August 13, 2020, the proposal was approved by 16 of the 22 ICON P-Reps and adopted into the ICON network.

64.     On August 22, 2020, Shin attempted to direct some of his staked ICX tokens from being delegated to one P-Rep to being delegated to another through the ICONex wallet. He selected a new P-Rep and "voted" his delegated tokens toward that P-Rep.

65.     After initiating the redelegation process within ICONex, a process he had performed many times before, Shin noticed that 25,000 new ICX tokens had appeared in his wallet.

66.     Shin thought that there was a visual bug with the wallet software. He tried redelegating his tokens again and saw that another 25,000 ICX tokens had appeared in his wallet.

67. Shin did nothing to access or alter (nor could he have) the underlying ICON network protocol, nor does he know why the protocol awarded him 25,000 newly minted ICX tokens every time he initiated the redelegating process.

68. Shin's process is demonstrated below. At the outset, the wallet at issue had minimal ICX that could be transferred.



69. To initiate the redelegation process, Shin selected his delegated ICX (*i.e.*, the staked ICX designated towards a P-Rep):



70.    Shin then input that he wished to redelegate these tokens (selecting the P-Rep Rhizome):



71.    The system prompted Shin to confirm that he intended to redelegate those tokens:



72.    After doing so, Shin found that his wallet now had 25,000 new tokens:



73.     Considering that the protocol was awarding him ICX tokens every time he initiated the redelegation process, Shin continued to repeat the process. By the end of the day, he had received approximately 14 million ICX tokens from the ICX protocol.

74.     The circumstances were as if Shin walked into a casino, placed a quarter in a video poker machine, pressed a series of buttons, and won a jackpot. Staying at the machine, Shin continued to put in quarters, press the same buttons, and win another jackpot. However, unlike the jackpot winnings, which had belonged to the casino, the ICX tokens Shin acquired were issued the moment Shin received them and were not taken from the possession or control of ICON or any ICX user.

75.     Shin's actions were not malicious. The authors and developers of the Revision 9 Proposal may not have intended for the network proposal to behave as it did, but this was the proposal that the P-Reps had agreed to and did adopt into the network.

76.     Shin was the lawful owner of the ~14 million ICX tokens rewarded to him on August 22, 2020.

**E.  ICON Defamed Shin to Binance and Kraken and Thereby Directed Them to Freeze Shin's ICX Tokens**

77.     After accumulating the ICX tokens, Shin transferred a significant portion of them to Kraken and Binance—two of the largest crypto-asset exchanges. A few hours later, he learned that he could no longer transfer *any* of his ICX tokens.

78.     This was because ICON had contacted Kraken and Binance and directed them to freeze Shin's accounts on those exchanges, which they did.

79.     ICON informed Kraken and Binance that Shin was a "malicious attacker" and that the ICX tokens Shin transferred to their exchanges were "stolen." Indeed, less than a day later, ICON wrote in a Medium post that "[e]xchanges were notified with [Shin's] accounts to freeze

and to disable deposits and withdrawals." In that same post, ICON called Shin a "malicious attacker" and referred to his ICX tokens as "stolen."

80.     The statements that ICON made to Binance and Kraken, and in the public Medium post, asserting that Shin was a "malicious attacker" who had acquired "stolen" funds, and thus accusing him of having acted criminally, were false.

81.     Binance and Kraken froze Shin's accounts based on these false statements.

82.     ICON did this deliberately to interfere with Shin's ownership of both his ICX tokens all of the other crypto-assets he owned on those exchanges.

83.     Shin came to learn that he could no longer transfer *any* cryptocurrencies on *any* exchanges. ICON had told these exchanges to blacklist all of his accounts for all purposes.

## F.  ICON Interferes With the Remainder of Shin's ICX Tokens

84.     Although Shin had transferred a significant portion of his ICX tokens to Kraken and Binance, he continued to hold the vast majority of his tokens, including the original 150,000 ICX tokens he had previously purchased, on his local ICX wallet.

85.     On August 24, 2020, ICON announced on Medium the release of another software fork proposal (the "Revision 10 proposal") that sought to correct the bug that Shin discovered.[2] They explained that on August 22, an account had "attack[ed] the ICON Network" and so they had to remove a function and "blacklist the attacker's accounts."

86.     They also disclosed Shin's wallet address, which is sufficient to link the attack to Shin for many members of the cryptocurrency community.  ICON admitted that "[e]xchanges were notified with specific accounts to freeze and to disable deposits and withdrawals." ICON also informed the ICON community that they *were able to recover the majority of the stolen funds*"

---

[2] https://medium.com/helloiconworld/network-update-revision-10-b0ce0bd68cbe.

1  and had plans to destroy 20 million ICX tokens from circulation to account for additional tokens

2  that had been created.

3       87.    This post contains multiple misrepresentations:

4       • *First*, it is false that ICX recovered the majority of the funds. Shin still has access,

5          albeit restricted access, to the majority of the 14 million ICX tokens he generated,

6          despite ICON's unlawful attempts to prevent him from accessing or using them.

7       • *Second*, Shin did not "attack" the network. The ICON foundation issued a software

8          fork that empowered any user to create additional ICX tokens. Shin merely initiated

9          a series of transactions directly facilitated by the ICON blockchain and expressly

10         permitted by ICON and the P-Reps.

11      • *Third*, it is false that the tokens were all created by a single account. Shin created

12         14 million tokens, and ICON admitted that nearly 20 million ICX tokens were

13         created through the bug. Other users thus created 6 million tokens.

14

15      88.    The Revision 10 network proposal posted on ICON's website stated that the

16  proposal was aimed at "fixing a vulnerability." The proposal did not reveal that it was also aimed

17  at interfering with and programmatically restricting all of Shin's ICX.

18      89.    The two posts publicly published by ICON and directed to all P-Reps, ICX holders,

19  and stakeholders contained false statements about Shin. ICON privately communicated similar

20  false statements to one or more P-Reps and ICX holders.

21      90.    ICON fabricated and communicated both public and private false statements for the

22  purpose of encouraging, coercing, and ensuring support for its Revision 10 Proposal, which ICON

23  deliberately designed and intended to interfere with Shin's ICX tokens.

91.     The P-Reps and ICX token holders relied on these false statements in voting to approve of Revision 10.

92.     The Revision 10 Proposal released by the ICON network effectively froze all of Shin's ICX tokens, including the ICX tokens he had previously purchased. ICON changed its code to target Shin, and in doing so took his property.

93.     In the casino analogy, ICON's actions are akin to the casino owner seizing not only what the player won on the slot-machine, but also the money he had when he sat down to play.

94.     Indeed, at least one of the P-Reps publicly commentated that Shin did nothing malicious and that he should keep the ICX tokens:

> There was no stealing. The code functioned as it was written. Unfortunate for the project but I personally think the actor (I don't think he was a hacker because he didn't hack anything) should be able to keep the ICX and do as he pleases.
>
> To be completely honest, I think the Foundation mitigated this in the wrong way. Instead of announcing new code review protocols, boosting development resources, etc, they pointed fingers at someone and started calling them a hacker. Very disappointing.

95.     After freezing his ICX tokens, ICON stepped up their efforts to intimidate Shin in an apparent effort to scare him from publicly revealing their error.

96.     On August 24, 2020, Ricky Dodds, the ICON Strategy and Communications Lead, reached out to Shin via Twitter Direct Messages. Dodds told Shin that ICON viewed him as a "malicious hacker" and threatened to contact "law enforcement within 24 hours" if he did not return the ICX tokens. Neither Dodds nor ICON ever intended to contact law enforcement, because they knew that Shin had not committed any crime.

97.     Since this incident, Shin has been unable to trade any of his ICX tokens. He has also been frozen out of his Binance and Kraken accounts, preventing him from accessing any of

the crypto-assets he owned on those accounts. Shin was therefore unable to profit from the surge in value of ICX tokens that occurred in August 2020.

### G. ICON Has De facto Control Over the ICON Network

98.  Despite ICON's claim that it "aims for decentralized governance," software forks on the ICON network are released through a centralized process that ICON controls.

99.  The ICON Network appoints 22 "Main P-Reps."  These Main P-Reps are chosen by determining which P-Reps have the most ICX staked to their accounts.

100.  In order implement a software fork proposal, the proposal must receive approval from (1) at least 15 of the 22 P-Reps and (2) reach 67% of the "stake weighted ICX vote" of the current P-Reps.

101.  The manner in which Revision 10 and other Network Proposals have been historically implemented demonstrates that ICON has de facto control over the implementation of network proposals.

102.  *First*, ICON's public statements signal its control over the Network Proposal approval process. For example, less than a day after implanting Revision 10, ICON publicly announced stated "*we* were able to recover the majority of the stolen funds." (emphasis added).

103.  Other ICX users also believe that ICON has de facto control over Network Proposals. For example, shortly after a separate bug was revealed during the implementation of a July 2020 Network Proposal, one ICX user commented that "[t]he ICON team needs to get more familiar with *their own* codebase"; "[t]he team should perform an audit on the whole codebase to ensure something like this never happens again"; and "Unfortunately, I'm not optimistic. As history as shown us, the ICON team has never taken testnet seriously." *See* https://brianli.com/icon-weekly-1-band-protocol-100x-fees-and-rhizome-citizen-node-endpoint/.

104.     Even ICON's founder, Min Kim, publicly admitted that ICON was responsible for the issues arising from ICON's implantation of that same network proposal, commenting on Twitter that "there is no excuse for mistakes. Period. We take full responsibility for this and cover any damage . . . We'd eventually get to a point where ICON network is large enough so it's absolutely necessary and more cost efficient to push proposals and codes more slowly and carefully. You'll know when we get there."



Min @minhokim · Jul 27, 2020
4/ We'd eventually get to a point where ICON network is large enough so it's absolutely necessary and more cost efficient to push proposals and codes more slowly and carefully. You'll know when we get there.
♡ 1    ⟲ 4    ♡ 41

Min @minhokim · Jul 27, 2020
5/ Every mistake looks amateurish and preventable in hindsight. We humans tend to simply overlook answer to easiest question b/c we assume it's correct. And usually 99 out 100, we are correct.
♡ 1    ⟲ 5    ♡ 43

Min @minhokim · Jul 27, 2020
6/ I don't lose sleep over mistakes like this. ICONLOOP are pros. They have an extensive experience w enterprises. ICONLOOP sets up enterprises for system failures/errors. This is exactly why we've been designing a hybrid blockchain.

/end
♡    ⟲ 5    ♡ 59

105. *Second*, at all relevant times, including during the implementation of Revision 10, ICON directly controlled more than 30% of the total stake weighted vote.

106. ICON also controls ICX Station, the second largest P-Rep measured by stake weighted vote. ICX Station controlled more than 13% of the stake weighted vote at the time Revision 10 was implemented. Every individual on the team that runs ICX Station is also employed by ICON.

107. ICON's direct control of more than 43% of the stake weighted ICX vote share means that, *at minimum*, ICON can effectively block any network proposal that it does not approve.

108. *Lastly*, the speed in which the Revision 10 Network Proposal was implemented demonstrates that ICON coordinated with other P-Reps to direct and control their vote, likely relying on defamatory statements about Shin. Indeed, ICON achieved the 15 votes necessary to implement Revision 10 from P-Reps within a timespan of *just 10 minutes*:

**Total Voters**    Total Token Votes

| Voter | Answer | Tx hash | Time (UTC-5) |
|---|---|---|---|
| Citadel.one | Agree | 0x993628132de853cd08de844eecb0a8a11436fa0d5376a65677ebb3... | 2020-08-23 01:51:33 |
| Everstake | Agree | 0x28066cd33009dbcab7d3b8d6670e5c20da8f1e225ca123961d17c8d... | 2020-08-23 01:49:44 |
| ICONbet Community | Agree | 0x903c87bbdc0125b9e0fa73ef058c20acfaec901d9f2fbc6931c3ea546... | 2020-08-23 01:49:24 |
| ICX_Station | Agree | 0x5e135ad2ce3462b6b8d175e8e553c14312ca62818b6b9acf84f59c97... | 2020-08-23 01:46:24 |
| NEOPLY | Agree | 0x6f79f82b0addfd38289e6c862d7d8f00b12003bb3e4568f8fafe4a37... | 2020-08-23 01:45:50 |
| ICONVIET | Agree | 0x7bff9f1b2a43cb8385d1972a4e7e4f8475674a9ce82e669b50ecc956... | 2020-08-23 01:45:23 |
| ICON DAO | Agree | 0x86acd505cbb17cdd6387690188a087e16332709ba3566503a79c441... | 2020-08-23 01:44:06 |
| RHIZOME | Agree | 0x031f81e863eb43ffebbd261d20077708cb73b3e3814e03625e88a771... | 2020-08-23 01:43:37 |
| ICON Hyperconnect | Agree | 0xb68c85fbaccb53a8977aac1699dd92124d8acb51e325bb8842d6f8d2... | 2020-08-23 01:43:02 |
| PARROT9 | Agree | 0x2ef2a8c580626f2a82190c20ee1c971449a2c1ad84126aaebf106ded... | 2020-08-23 01:42:22 |
| Blockmove | Agree | 0x2c590c4e74108108e6b5afeb4b770c8137b210f041ee4b70168bb1... | 2020-08-23 01:42:02 |
| ICON Foundation | Agree | 0x4a79ea382a4d91fcb80ba3872dc778bbaaa8414ce9049a1319e1720c... | 2020-08-23 01:41:57 |
| ReliantNode | Agree | 0xe04c65b2816e84659ede34463ac187e9731df5ddbe2c822fc61464e... | 2020-08-23 01:41:46 |
| ICONation | Agree | 0xdc00d5773a4931c352a6981e36777e79f32c8bbb042988bfad04439... | 2020-08-23 01:41:26 |
| Mineable | Agree | 0xa7b7fa8d55db08fd3739629ce24b06edd65c17f9c752b6f04121140af... | 2020-08-23 01:41:26 |

109.     ICON allowed other network proposals to be voted on over the period of many hours. Indeed, the average network proposal takes approximately 10 hours.

110.     ICON's ability to effectively freeze 14 million ICX in the matter of minutes demonstrates its control and responsibility for the decisions and acts that dispossessed Shin of his ICX tokens.

111.     Indeed, the P-Reps, acting under the direct control or as agents of ICON, have never rejected a network proposal submitted by ICON.

112.     Accordingly, ICON's de facto control over the ICON network allowed it to exercise dominion and control over Shin's ICX tokens through its implementation of Revision 10 and effective freezing of his ICX tokens.

113.     ICON's actions have caused Shin to seek the assistance of the Court to regain the use and enjoyment of his property.

**CAUSES OF ACTION**

**COUNT ONE**
**DECLARATORY JUDGMENT**

114.     Shin incorporates the allegations above.

115.     Shin owns the ICX Tokens that were issued to him on August 22, 2020, and ICON has interfered with Shin's ownership of these tokens.

116.     Shin also owns the ICX tokens that he had accumulated prior to August 22, 2020, and the other types of tokens that he had acquired before and after that date, ICON has interfered with Shin's ownership of these tokens as well.

117.     Under 28 U.S.C. § 2201(a), an actual controversy exists between the parties because ICON has taken the position, including through counsel, that Shin does not own the ICX Tokens that were issued to him on August 22, 2020, and that Shin is not entitled to exercise his property interests in the tokens that he had accumulated prior to that date.

118.     ICON's actions have been consistent with the foregoing description of ICON's position regarding Shin's ownership and property interests, leaving the parties with a fixed disagreement over rights in need of judicial clarification.

119.     Accordingly, Shin seeks and is entitled to a declaratory judgment that the ICX tokens issued on August 22, 2020, are his property and that he is entitled to exercise his property interests in the ICX tokens that he had accumulated prior to that date, and in the other types of tokens that he had acquired before and after that date.

**COUNT TWO**
**CONVERSION**

120.     Shin incorporates the allegations above.

121.     At all relevant times, Shin maintained a possessory interest in the ICX tokens in his wallets, including those he was awarded on August 22, 2020.

Amended Complaint
24

122.    In preventing Shin from transferring these ICX tokens anywhere and effectively freezing them, ICON exercised dominion and control over Shin's property, without authorization.

123.    Shin has asked ICON to return the ICX tokens to him, and ICON has refused.

124.    Accordingly, Shin seeks compensatory damages, punitive damages, and reasonable attorneys' fees and costs.

**COUNT THREE**
**TRESPASS TO CHATTEL**

125.    Shin incorporates the allegations above.

126.    At all relevant times, Shin maintained a possessory interest in the ICX tokens in his wallets, including those he was awarded on August 22, 2020.

127.    ICON intentionally accessed Shin's ICX tokens and interfered with his use of his property by, *inter alia*, preventing him from transferring or exchanging the tokens.

128.    Icon's acts were the direct and proximate cause of Shin's injury, including his loss of use of his property and his inability to trade it for value.

129.    Accordingly, Shin seeks compensatory damages, punitive damages, and reasonable attorneys' fees and costs.

**COUNT FOUR**
**DEFAMATION**

130.    Shin incorporates the allegations above.

131.    ICON's assertions that Shin is a "malicious attacker" who had acquired "stolen" funds, made both publicly and to the exchanges described above, were of and concerning Shin, accuse him of having acted criminally, and were false.

132.    The false statements constitute defamation *per se* because they impugn Shin's basic integrity, creditworthiness, and/or competence.

133.     ICON made the false statements either knowing that the statements were false or with reckless disregard for the truth.

134.     The false statements were not protected by any privilege or authorization.

135.     Shin has been damaged as a direct and proximate result of ICON's publication of these false statements, the full amount of which damages will be proven at trial.

136.     ICON's conduct was willful, malicious, and oppressive, in that ICON knew that the false statements would harm Shin. As such, in addition to compensatory damages and/or presumed damages, Shin demands punitive damages relating to ICON's publication and maintenance of the false statements, in an amount to be determined at trial.

### COUNT FIVE
### PRIMA FACIE TORT

137.     Shin incorporates the allegations above.

138.     At all relevant times, Shin maintained a possessory interest in the ICX tokens in his wallets, including those he was awarded on August 22, 2020.

139.     ICON, through its intentional development and release of the Revision 10 proposal, intentionally inflicted harm upon Shin by interfering and preventing his use of his ICX tokens.

140.     This interference was without Shin's consent. ICON's blacklisting of the Shin's ICX tokens was without any legal excuse or justification.

141.     As a result of ICON's conduct, Shin has suffered harm and injury as a result of being unable to use any of the ICX tokens he lawfully acquired.

142.     ICON thus committed prima facie tort at least to the extent its conduct does not give rise to any other recognized tort.

**PRAYER FOR RELIEF**

WHEREFORE, Shin respectfully prays for relief as follows:

    a.  A judgment that Shin owns the ICX tokens at issue.

    b.  A judgment that ICON trespassed on Shin's chattel by preventing him from trading his tokens without any justification or doing so.

    c.  A judgment that ICON defamed Shin both by making false statements publicly and by making false statements to certain exchanges.

    d.  An award of damages in an amount to be determined at trial.

    e.  An award of punitive damages in an amount to be determined at trial.

    f.  An award of pre- and post- judgment interest.

    g.  Expenses, costs, and attorneys' fees.

    h.  Such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMAND**

Shin demands a trial by jury for all claims.

Dated: January 8, 2020          ROCHE CYRULNIK FREEDMAN LLP

                                      */s Kyle Roche*
                                      Kyle Roche (*pro hac vice*)
                                      Edward Normand (*pro hac vice*)
                                      Ivy T. Ngo
                                      Daniel Stone (*pro hac vice*)
                                      kyle@rcfllp.com
                                      tnormand@rcfllp.com
                                      ingo@rcfllp.com
                                      dstone@rcfllp.com
                                      99 Park Avenue, 19th Floor
                                      New York, NY 10016

                                      Katherine Eskovitz
                                      1158 26th Street, No. 175
                                      Santa Monica, CA 90403
                                      keskovitz@rcfllp.com
                                      (646) 791-6883

                                      *Counsel for Mark Shin*