# EXHIBIT U

1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    MARK SHIN,                              Case No.  20-cv-07363-WHO

                    Plaintiff,
8
                                            ORDER GRANTING MOTION TO
9          v.                               DISMISS WITH LEAVE TO AMEND
                                            AND DENYING MOTION TO STRIKE
10   ICON FOUNDATION,                       WITHOUT PREJUDICE

                    Defendant.              Re: Dkt. Nos. 36, 37
11

12

13          Plaintiff Mark Shin alleges that defendant ICON Foundation ("ICON") improperly

14   interfered with his ownership and possession of ICX tokens, a crypto-asset native to the ICON

15   blockchain network ("ICON Network").  ICON moves to dismiss all claims in the Amended

16   Complaint as insufficiently pleaded and moves to strike the defamation claim under Colorado's

17   anti-SLAPP statute, which is nearly identical to California's anti-SLAPP statute, Cal. Code Civ.

18   Proc. § 425.16.  For the reasons set forth below, ICON's motion to dismiss is GRANTED with

19   leave to amend for except Shin's fifth cause of action for prima facie tort, which is not a

20   cognizable claim under either California or Colorado law and is dismissed with prejudice.

21   Because I give Shin leave to fix the deficiencies addressed in this order, ICON's motion to strike

22   is DENIED without prejudice.

23                                   **BACKGROUND**

24   I.     **FACTUAL BACKGROUND**

25          I start with a background on cryptocurrency and the ICON Network to inform the

26   allegations made in this case.  I then turn to the underlying incident that occurred in August 2020.

27          A.     **Crypto-assets and Blockchains**

28          Crypto-assets "are digital assets that use a variety of cryptographic principles to secure

1   transactions, control the creation of additional units, and verify their transfer."  Amended

2   Complaint ("Am. Compl.") [Dkt. No. 28] ¶ 19.  The first major crypto-asset was bitcoin.  *Id.* ¶ 20.

3   The core feature of bitcoin, and nearly every other crypto-asset, is a ledger, called the blockchain,

4   "that tracks the ownership and transfer of bitcoin in existence."  *Id.* ¶ 21.  "Each bitcoin user has a

5   digital 'address' used to receive bitcoin.  The bitcoin blockchain lists, publicly, every address and

6   the number of bitcoin associated with that address.  The blockchain shows every bitcoin

7   transaction in which that address has engaged."  *Id.* ¶ 22.

8       There are now more than 8,000 crytocurrencies, including ICX tokens on the ICON

9   blockchain.  *Id.* ¶¶ 4, 24.  "These cryptocurrencies generally distinguish themselves through

10   different iterations of similar features: a degree of decentralized governance (*i.e.*, no central

11   authority dictates which transactions are authorized); a degree of supply management (*i.e.*, the

12   community understands in what circumstances additional tokens will be generated and to whom

13   they will be given); and a blockchain."  *Id.* ¶ 26.

14       Blockchains generate new cryptocurrencies in different ways.  Bitcoin, for example,

15   "maintains its blockchain and provides for new bitcoin to enter the economy through a consensus

16   mechanism known as 'mining,' or 'proof of work.'"  *Id.* ¶ 29.  In this type of blockchain,

17   cryptocurrencies are "mined" by "having sophisticated computer programs perform complex,

18   resource-intensive automated verifications of past transactions, which are then added to the

19   blockchain."  *Id.*  Miners are "rewarded with new bitcoin" for their efforts.  *Id.*

20       Other blockchains, including the ICON Network, generate new cryptocurrencies through a

21   "consensus mechanism called 'proof of stake,' which provides new currency to those who own the

22   most of that currency instead of those who expend significant electrical resources mining."  *Id.* ¶¶

23   30, 32, 52.  "Under the proof-of-stake consensus mechanism, individuals must 'stake' their crypto-

24   assets to be eligible to receive newly minted tokens.  Issuers of some crypto-assets impose rules on

25   staking, such as (1) requiring minimum amounts; (2) imposing a minimum staking period; and (3)

26   imposing requirements on when an individual can 'unstake' their tokens."  *Id.* ¶ 31.

27       **B.      Transfer and Exchange of Crypto-Assets**

28       Control of crypto-assets is shown primarily through control of cryptographic keys,

United States District Court
Northern District of California

United States District Court
Northern District of California

1    composing of two components: a public key and a private key.  *Id.* ¶ 33.  The cryptographic

2    system of transfer and exchange is generally the same across most crypto-assets, including bitcoin

3    and ICX.  *Id.*

4          For example, a public key is used to produce the bitcoin address, *i.e.*, "a destination for

5    transfers of bitcoin, like the account number of a conventional bank account."  *Id.* ¶ 34.  Bitcoin

6    addresses are "long strings of alphanumeric text, often abbreviated by a small group of numbers

7    and letters appearing in a string, such as 1s5F or R3w9."  *Id.* ¶ 34.  "A private key allows owners

8    of a bitcoin address to access it, like a long PIN or password for a conventional bank account."  *Id.*

9    ¶ 35.  "A transfer of bitcoin is public to the extent that anyone can see the transferor's bitcoin

10   address, the recipient's bitcoin address, and the quantity of assets transferred."  *Id.*  ¶ 37.  For

11   instance, "anyone could see that bitcoin address 1s5F transferred 10.3 bitcoin to bitcoin address

12   R3w9," but the "names of the individuals or entities that control these addresses . . . are private."

13   *Id.*

14         Crypto-exchanges enable smoother and faster trading between individuals.  *Id.* ¶ 38.  To

15   trade crypto-assets on a crypto-exchange, such as Kraken, Binance, or Velic, a user must first

16   create an account on that exchange.  *Id.* ¶¶ 39, 59.  "The exchange will then provide that customer

17   with a deposit address that the exchange controls" and "[w]hen the customer deposits crypto-

18   assets into that deposit address, the exchange will credit her trading account with the

19   corresponding crypto-asset," and "then transfer the crypto-assets into one of its other addresses for

20   storage."  *Id.* ¶ 39.  One "cannot easily trace transactions belonging to a particular individual,"

21   because the deposit addresses are "often different each time the customer makes a transfer."  *Id.* ¶

22   40.  "When a customer wants to withdraw a crypto-asset from an exchange, she tells the exchange

23   the address into which she would like her crypto-assets transferred, typically the address of the

24   user's wallet, " and "[t]he exchange then debits the user's account and transfers a corresponding

25   amount of crypto-asset from the exchange's reserves to that address."  *Id.* ¶ 42.

26         **C.     The ICON Network and ICX Tokens**

27         As stated above, the ICON Network is a delegated proof-of-stake blockchain.  *Id.* ¶¶ 32,

28   52.  ICON "essentially aims for decentralized governance," where transactions "are verified by a

3

United States District Court
Northern District of California

1   ledger shared within the community network itself, not controlled by a centralized authority." *Id.*

2   ¶ 49.  To achieve such decentralization, ICON "incentivized its users to run full nodes that

3   themselves were comprised of community Public Representatives ('P-Reps')." *Id.* ¶ 50.  A node

4   "is a computer that connects to a crypto-asset network," whereas full nodes "enforce all of the

5   rules of the network." *Id.* ¶ 45.  Full node users "validate, send, and receive transactions and

6   maintain a copy of the blockchain they are operating." *Id.* ¶ 46.

7        The ICON Network is controlled by 22 P-Reps.  *Id.* ¶¶ 50, 63.  P-Reps are able to "change

8   the policies of the various nodes or communities of which they are part" on the ICON Network,

9   and, through their voting power can "determine when to update the code underlying the ICON

10  Network and help contribute to the overall ICON ecosystem by developing new apps and new

11  features for the code." *Id.* ¶ 50.  To implement proposed changes or updates to the ICON

12  Network, the proposal must receive approval from at least 15 of the 22 P-Reps and reach 67% of

13  the "stake weighted ICX vote" of the current P-Reps.  *Id.* ¶ 100.

14       The ICON Network requires users to "stake" their ICX to vote for a particular P-Rep.  *Id.* ¶

15  51.  Users can change their votes from one P-Rep to another.  *Id.* ¶¶ 51, 64.  While staking ICX

16  comes at the cost of "remov[ing] it from circulation"—because the ICX is locked and not

17  available for trading—users are "rewarded" for staking ICX by receiving newly-generated ICX.

18  *Id.* ¶¶ 52, 54.  Users can "unstake" or unlock previously-staked ICX, a process which typically

19  takes anywhere from five to twenty days.  *Id.* ¶ 53.  Shin has purchased more than 250,000 ICX

20  tokens since 2017, 150,000 of which have been staked on the ICON Network.  *Id.* ¶ 58.

21       **D.    Revision 9 and Shin's Acquisition of ICX Tokens**

22       Sometime in August 2020, ICON published a software proposal, the "Revision 9

23  Proposal," which included a series of updates.  *Id.* ¶ 62.  On August 13, 2020, the Revision 9

24  Proposal was approved by 16 of the 22 ICON P-Reps and adopted into the ICON Network.  *Id.* ¶

25  63.

26       On August 22, 2020, following the implementation of Revision 9, Shin attempted to direct

27  some of his staked ICX tokens from one P-Rep to another P-Rep through his ICON wallet.  *Id.* ¶

28  64.  After initiating the redelegation process, "a process he had performed many times before, Shin

United States District Court
Northern District of California

1     noticed that 25,000 new ICX tokens had appeared in his wallet." *Id.* ¶ 65.  He thought that there

2     was a "visual bug with the wallet software." *Id.* ¶ 66.  When he tried redelegating his tokens

3     again, he saw another 25,000 ICX tokens appear in his wallet. *Id*; *see id.* ¶¶ 68–72 (describing the

4     redelegating process performed by Shin with corresponding screenshots).  "Considering that the

5     protocol was awarding him ICX tokens every time he initiated the redelegation process, Shin

6     continued to repeat the process," and "[b]y the end of the day, he had received approximately 14

7     million ICX tokens from the ICX protocol." *Id.* ¶ 73.

8         Shin analogizes the situation to as if he was at a slot machine that continued to provide

9     jackpot winning each time he put quarters in and pressed the same buttons, except that "the ICX

10    tokens [he] acquired were issued the moment [he] received them and were not taken from the

11    possession or control of ICON or any ICX user." *Id.* ¶ 74.  Although he acknowledges that "[t]he

12    authors and developers of the Revision 9 Proposal may not have intended for the network proposal

13    to behave as it did," he argues that his actions were not malicious and that he is the "lawful owner

14    of the ~14 million ICX tokens rewarded to him on August 22, 2020." *Id.* ¶¶ 75–76.

15        **E.**      **Revision 10 and Freezing Shin's Exchange Accounts and ICON Wallet**

16        After generating approximately 14 million ICX tokens, Shin transferred "a significant

17    portion of" the accumulated ICX tokens to crypto-asset exchanges Kraken and Binance (the

18    "Exchanges"). *Id.* ¶ 77.  "A few hours later, he learned that he could no longer transfer *any* of his

19    ICX tokens," including those purchased prior to August 22, 2020. *Id.* ¶ 77 (emphasis in original).

20    ICON allegedly contacted the Exchanges and told them that Shin was a "malicious attacker," that

21    the ICX tokens he transferred on their exchanges were "stolen"  and "directed them to freeze

22    Shin's accounts on those exchanges, which they did." *Id.* ¶¶ 78–79.  He contends that the

23    Exchanges relied on ICON's false statements in freezing his accounts. *Id.* ¶ 81.

24        On August 24, 2020, ICON posted on the Medium website (the "Medium Post") to inform

25    the public that the ICON Network "experienced an attack by a malicious individual exploiting a

26    vulnerability in the Multiple Unstaking Requests feature." *Id.* ¶ 85 n.2 (hyperlink to the Medium

27

28

United States District Court
Northern District of California

1    Post).[1]   The Medium Post stated that, following the Revision 9 update, "a few community

2    members altered telegram admins of unusual activity with a specific user account," which "was

3    immediately escalated to ICON Team members" to investigate.  *Id.*  "The ICON Team, along with

4    the help of dedicated community members and P-Reps, identified that the account was attacking

5    the ICON Network using the 'SetDelegate' function to mint unauthorized ICX tokens." *Id.*  ICON

6    announced that "[t]hanks to the efforts of our exchange partners, P-Reps, and community

7    members, we were able to recover the majority of the stolen funds and we know, with certainty,

8    the identity of the attacker." *Id.*  "Exchanges were notified with specific accounts to freeze,"

9    "[t]he network was then upgraded," and "the attacker was permanently stopped."  *Id.*

10          With respect to the Revision 10 update mentioned in the Medium Post, Shin contends that

11   ICON's Revision 10 Proposal only stated that it was aimed at "fixing a vulnerability," but did not

12   reveal "that it was also aimed at interfering with and programmatically restricting all of Shin's

13   ICX," "effectively fr[eezing] all of [his] ICX tokens, including the ICX tokens he had previously

14   purchased."  *Id.* ¶¶ 88, 92.  He alleges that "ICON fabricated and communicated both public and

15   private false statements for the purpose of encouraging, coercing, and ensuring support for its

16   Revision 10 Proposal, which ICON deliberately designed and intended to interfere with Shin's

17   ICX tokens." *Id.* ¶ 90.  Despite ICON's claimed decentralized governance, he asserts that ICON

18   exercised its de facto control over the ICON Network and the P-Reps in order to implement the

19   Revision 10 Proposal.  *Id.* ¶¶ 98–113.  ICON achieved the 15 P-Rep votes necessary to implement

20   the Revision 10 Proposal "within a timespan of *just 10 minutes*," when the average network

21   proposal takes approximately 10 hours.  *Id.* ¶¶ 108–09 (emphasis in original).

22          Shin claims that ICON used him as a scapegoat to distract from their culpability in

23   releasing an undisclosed bug into the ICON Network through the faulty Revision 9 update.  He

24   quotes one P-Rep who publicly commented:

25               There  was  no  stealing.   The  code  functioned  as  it  was  written.

26   
27   [1] Because the Amended Complaint references the Medium Post, available at
     https://medium.com/helloiconworld/network-update-revision-10-b0ce0bd68cbe, I will consider it
28   in deciding ICON's motion to dismiss.  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988,
     998–99 (9th Cir. 2018).

> Unfortunate for the project but I personally think the actor (I don't think he was a hacker because he didn't hack anything) should be able to keep the ICX and do as he pleases.  To be completely honest, I think the Foundation mitigated this in the wrong way.  Instead of announcing new code review protocols, boosting development resources, etc, they pointed fingers at someone and started calling them a hacker.  Very disappointing.

*Id.* ¶ 94.

ICON "stepped up" their efforts to "intimidate Shin in an apparent effort to scare him from publicly revealing their error."  *Id.* ¶ 95.  On August 24, 2020, Ricky Dodds, the ICON Strategy and Communications Lead, "reached out to Shin via Twitter Direct Messages and told Shin that ICON viewed him as a 'malicious hacker' and threatened to contact 'law enforcement within 24 hours' if he did not return the ICX tokens."  *Id.* ¶ 96.  Shin contends that "[n]either Dodds nor ICON ever intended to contact law enforcement, because they knew that [he] had not committed any crime."  *Id.*  Since the incident, he has been unable to "trade any of his ICX tokens," and has "also been frozen out of his Binance and Kraken accounts, preventing him from accessing any of the crypto-assets he owned on those accounts."  *Id.* ¶ 97.

**F.      Causes of Action**

Based on these allegations, Shin pursues the following five cause of action: (i) a claim for declaratory relief regarding his property rights; (ii) conversion; (iii) trespass to chattel; (iv) defamation; and (v) prima facie tort.  In opposition to ICON's motion to dismiss, he clarifies that his declaratory relief, conversion, and trespass to chattel claims are asserted under California law and his defamation and prima facie tort claims are asserted under Colorado law.  Plaintiff's Opposition to Defendant's Motion to Dismiss ("Oppo. MTD") [Dkt. No. 45] 3, 7.  He requests relief in multiple forms, including a claim for punitive damages, but has dropped his claim to attorneys' fees.  *Id.* at 3 n.2.

**II.      PROCEDURAL BACKGROUND**

Shin filed this lawsuit on October 20, 2020.  Complaint [Dkt. No. 1].  On January 8, 2021, he filed an Amended Complaint, mooting ICON's first motion to dismiss.  On February 12, 2021, ICON moved to dismiss all the claims in the Amended Complaint and moved to strike the defamation claim under California's anti-SLAPP rule.  *See* Motion to Dismiss Amended

United States District Court
Northern District of California

7

1   Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) ("MTD") [Dkt. No. 36]; Motion to Strike

2   Allegations in Amended Complaint Pursuant to Cal. Civ. Proc. Code § 425.16 ("Mot. Strike")

3   [Dkt. No. 37].  I heard argument on April 28, 2021.

## LEGAL STANDARD

5         Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint

6   if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to

7   dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its

8   face."  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible

9   when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the

10   defendant is liable for the misconduct alleged."  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

11   (citation omitted).  There must be "more than a sheer possibility that a defendant has acted

12   unlawfully."  *Id.*  While courts do not require "heightened fact pleading of specifics," a plaintiff

13   must allege facts sufficient to "raise a right to relief above the speculative level."  *See Twombly*,

14   550 U.S. at 555, 570.

15         In deciding whether the plaintiff has stated a claim upon which relief can be granted, the

16   Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the

17   plaintiff.  *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court

18   is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of

19   fact, or unreasonable inferences."  *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir.

20   2008).

## DISCUSSION

22   **I.      DEFAMATION**

23         Shin asserts this claim under Colorado law; the parties agree that there are no material

24   differences in the common law of defamation in California and Colorado and cite to both state

25   laws in their briefing.  Under Colorado law, a plaintiff must establish the following elements: "(1)

26   a defamatory statement concerning another; (2) published to a third party; (3) with fault amounting

27   to at least negligence on the part of the publisher; and (4) either actionability of the statement

28   irrespective of special damages or the existence of special damages to the plaintiff caused by the

United States District Court
Northern District of California

8

1   publication." *Restore Life USA, Inc. v. LifeNews.com*, 2020 WL 1627041, at *2 (D. Colo. Feb. 13,

2   2020) (quotations omitted).

3       Shin alleges that ICON defamed him on two occasions: (i) in the Medium Post when

4   ICON called him "malicious attacker" who acquired "stolen" ICX and (ii) when it purportedly

5   contacted Kraken and Binance and informed them of the same.  Am. Compl. ¶¶ 80, 131.  ICON

6   moves to dismiss the claim as insufficiently alleged under Rule 12(b)(6) and barred by Colorado's

7   anti-SLAPP statute, which is nearly identical to California's anti-SLAPP statute.

8       **A.    Sufficiency of Allegations**

9           **1.    Identifying Shin**

10      "As common sense suggests, an allegedly defamatory remark is not actionable if it cannot

11  reasonably be understood as an assertion of actual fact pertaining to the plaintiff."  *Restore Life*,

12  2020 WL 1627041, at *5 (quoting *NBC Subsidiary (KCNC-TV), Inc. v. Living Will Ctr.*, 879 P.2d

13  6, 15 (Colo. 1994)).  Shin concedes that the Medium Post did not mention him by name.  Instead,

14  he claims that the Medium Post contained a link to a spreadsheet detailing the transactions that

15  Shin performed on August 22, 2020.  That spreadsheet contained his ICON wallet address (a

16  string of alphanumeric text), which he alleges "is sufficient to link the attack to [him] for many

17  members of the cryptocurrency community."  Am. Compl. ¶ 86.  In his opposition brief, he claims

18  that ICON was able to identify him based on his wallet address and that ICON has access to no

19  more information about his identity than does any other member of the ICON community.  Oppo.

20  21.  Accordingly, he argues, there was a way for "anyone who read the blog post to identify [him]

21  by name," because the cryptocurrency community included members who knew Shin's wallet

22  address.  *Id.*

23      Shin's allegations are conclusory and implausible.  He does not explain how "many

24  members of the cryptocurrency community" were able to link his wallet address to him,

25  particularly when, as the Amended Complaint illustrates, cryptocurrency is grounded in

26  anonymity.  For example, he alleges that bitcoin, another cryptocurrency, is transferred publicly

27  "to the extent that anyone can see the transferor's bitcoin address, the recipient's bitcoin address,

28  and the quantity of assets transferred.  That is, anyone could see that bitcoin address 1s5F

*(left margin, vertical text)* United States District Court  Northern District of California

1    transferred 10.3 bitcoin to bitcoin address R3w9.  The names of the individuals or entities that

2    control these addresses, on the other hand, *are private*."  Am. Compl. ¶ 37 (emphasis added).  In

3    explaining how transfers are made to crypto-exchange platforms, he alleges that the "destination

4    address is often different each time the customer makes a transfer, meaning that *one cannot easily*

5    *trace* transactions belonging to a particular individual."  *Id.* ¶ 40 (emphasis added).  While he does

6    not straightforwardly explain the functionality of the ICON wallet address at issue, allegations

7    about how addresses work in other cryptocurrency contexts undermine his conclusory assertion

8    that anyone could identify him through his alphanumeric ICON wallet address.

9         That ICON was able to identify which *account* made the allegedly malicious transactions

10   on August 22, 2020 does not necessarily suggest that ICON knew that the account belonged to

11   Shin.  He contends that ICON has access to no more information about his identity than does any

12   other member of the ICON community, but he does not explain what that "information" is.  At the

13   hearing, he disputed ICON's contention that it did not know his identity until this lawsuit was

14   filed.  But even if ICON knew his identity, what matters for the purposes of pleading a defamation

15   claim is whether anyone who read ICON's statements in the Medium Post was able to identify

16   him.  Similarly, for his Twitter Direct Message allegation, he does not allege that Dodds knew

17   either his identity or the owner of the Twitter account to whom Dodds wrote.  There is no

18   allegation that Shin's identity was clearly tied to the Twitter account in question (as opposed to a

19   pseudonym Twitter username).

20        With respect to the defamatory statement ICON made to the Exchanges, Shin alleges that

21   each Exchange understood that ICON was referring to the "accounts" on which his transactions

22   were recorded.  Am. Compl. ¶¶ 77–79.  He contends that each Exchange knew that he maintained

23   the implicated accounts because he was required to provide that information when he opened those

24   accounts.   Oppo. MTD 21 (citing Am. Compl. ¶¶ 38–42).  The Amended Complaint only states

25   that "When a customer wishes to trade crypto-assets on an exchange, she must first create an

26   account on that exchange. The exchange will then provide that customer with a deposit address

27   that the exchange controls."  *Id.* ¶ 39.  It does not explain what "create[ing] an account" entails

28   and what type of identifying information is implicated in that process such that the Exchanges

United States District Court
Northern District of California

10

1    would know Shin's identity from what ICON told them.  If, as Shin argued at the hearing,

2    "anonymity dies" once users go to the Exchanges, then he must provide sufficient factual

3    allegations to support that assertion.

4          As currently pleaded, the Amended Complaint insufficiently alleges that the defamatory

5    statements made in the Medium Post and to the Exchanges identified Shin.  *See Carlisle v.*

6    *Fawcett Publ'ns Inc.,* 201 Cal. App. 2d 733, 741 (1962) (if the statement does not mention the

7    plaintiff by name, additional information must be alleged to connect the statement to the plaintiff);

8    *see also Golden N. Airways v. Tanana Publ'g Co.*, 218 F.2d 612, 622 (9th Cir. 1954) (stating in

9    the context of pleading "if the person is not referred to by name or in such manner as to be readily

10   identifiable from the descriptive matter in the publication, extrinsic facts must be alleged and

11   proved showing that a third person other than the person libeled understood it to refer to him").

12                    **2.    Unactionable Opinion**

13         Shin contends that the statements made to the Exchanges in the Medium Post, accusing

14   him of being a "malicious attacker" who had "stolen" funds, qualify as defamatory per se.  Am.

15   Compl. ¶¶ 131–32; *see Restore Life*, 2020 WL 1627041, at *4 ("Falsely accusing someone of a

16   crime is defamatory per se in Colorado.").  However, "[a]ccusations of criminal activity, like other

17   statements, are not actionable if the underlying facts are disclosed."  *Nicosia v. De Rooy*, 72 F.

18   Supp. 2d 1093, 1103 (N.D. Cal. 1999).  "A statement of opinion based on fully disclosed facts can

19   be punished only if the stated facts are themselves false and demeaning."  *Franklin v. Dynamic*

20   *Details, Inc.*, 116 Cal. App. 4th 375, 387–88 (2004) (finding emails which accused a plaintiff of

21   stealing copyrighted material were nonactionable opinions because the underlying facts were fully

22   disclosed); *Wynn v. Chanos*, 75 F. Supp. 3d 1228, 1237 (N.D. Cal. 2014) (dismissing defamation

23   claim at pleadings stage because, among other things, "the bases for Chanos's opinions were not

24   entirely undisclosed")  When facts are disclosed, "readers will understand they are getting the

25   author's interpretation of the facts presented."  *Wynn*, 75 F. Supp. 3d at 1233 (quoting *Standing*

26   *Comm. on Discipline of U.S. Dist. Court for Cent. Dist. of California v. Yagman*, 55 F.3d 1430,

27   1439 (9th Cir. 1995)).  Readers are then "free to accept or reject the author's opinion based on

28   their own independent evaluation of the facts."  *Overhill Farms, Inc. v. Lopez*, 190 Cal. App. 4th

United States District Court
Northern District of California

United States District Court
Northern District of California

1248, 1263 (2010).

ICON argues that the Medium Post disclosed the facts underlying its opinion such that anyone reading the post could have independently evaluated the facts and drawn their own conclusions about whether the August 2020 incident constituted a "malicious attack" and whether the minted ICX tokens are considered "stolen." *See Overhill Farms,* 190 Cal. App. 4th at 1263. Specifically, the Medium Post disclosed that the implementation of the Revision 9 proposal resulted in a vulnerability on the ICON Network that allowed someone to exploit the "SetDelegate" function and generate ICX in an unprecedented manner. *See* Am. Compl. ¶ 85 n.2 (incorporating hyperlink to the Medium Post by reference). It specified that when community members alerted administrators about unusual activity, administrators discovered that an account on the ICON Network was using the "SetDelegate" function to mint unauthorized ICX tokens. *Id.* The post concludes by informing the public that the Exchanges were notified with specific accounts to freeze, the ICON Network was upgraded, via Revision 10, and the attacker was permanently stopped. *Id.*

ICON contends that Shin cannot reasonably argue that these underlying facts are not true; he alleges the same in his Amended Complaint. *See id.* ¶¶ 62–63, 75 (discussing implementation of Revision 9, and acknowledging that the "authors and developers of the Revision 9 Proposal may not have intended for the network proposal to behave as it did"); *id.* ¶¶ 64–66, 73 (explaining that on August 22, 2020 he received 25,000 ICX each time he "initiated the redelegation process" to redirect some of his staked ICX, and although he thought it was a glitch, he "continued to repeat the process" "[c]onsidering that the protocol was awarding him ICX tokens every time he initiated the redelegation process," until he had received "approximately 14 million ICX tokens from the ICX protocol"); *id.* ¶¶ 77–78 (alleging that he transferred a significant portion of the 14 million ICX tokens to Kraken and Binance, but "[a] few hours later, he learned that he could no longer transfer any of his ICX tokens" because ICON had contacted Kraken and Binance to direct them to freeze his accounts); *id.* ¶¶ 81, 83, 85 (alleging his accounts were frozen or blacklisted and the ICON Network was updated with the implementation of Revision 10 "that sought to correct the bug that Shin discovered").

United States District Court
Northern District of California

1    Shin argues that the Medium Post contained at least three false statements that take it out

2    of the protectable opinion doctrine: (i) that ICON recovered the majority of the funds; (ii) that the

3    tokens created by the bug were all from a single account; and (iii) that Shin "attacked" the ICON

4    Network.  Am. Compl. ¶ 87.  He fails to explain how these alleged falsehoods challenge the

5    disclosed facts underlying ICON's statement.  It is unclear how ICON's recovery of the majority

6    of the funds *after* the purported attack is relevant to the disclosed facts underlying ICON's opinion

7    that the incident constituted an attack in the first place.  The second alleged falsehood—that

8    multiple accounts were involved instead of just one—suffers from the same flaw.  The third

9    alleged falsehood—that Shin "attacked" the ICON Network—is the concluding opinion at issue

10   itself.

11   The Medium Post outlined each of the facts underlying ICON's opinion about the August

12   22, 2020 incident.  Because Shin does not dispute those underlying facts in the Amended

13   Complaint, the phrases he identifies as defamatory—"malicious attacker" and the word "stolen"—

14   are unactionable opinions as pleaded and cannot form the basis of his defamation claim.

15               **3.    Pleading with Specificity**

16   ICON argues that Shin does not plead the statements it allegedly made to the Exchanges

17   with sufficient particularity.  The requirements of Rule 8 are met with respect to defamation

18   claims so long as the allegations provide the defendant with "sufficient notice of the

19   communications complained of to allow [the defendant] to defend [itself]."  *PAI Corp. v.*

20   *Integrated Sci. Sols., Inc.*, No. C-06-5349 JSW(JCS), 2007 WL 1229329, at *7 (N.D. Cal. Apr. 25,

21   2007) (citation omitted).  "Countless district courts," including this District, "have found that the

22   requirements of Rule 8 have not been met in cases where libel and slander claims failed to allege

23   the substance of the statements and/or the time and place in which they were made."  *Id.* at *8

24   (citing cases).

25   Shin alleges that ICON informed the Exchanges that he was a "malicious attacker" and that

26   the ICX tokens he transferred to their exchanges were "stolen."   Am. Compl. ¶ 79.  That suffices

27   for identifying the substance of the statements underlying his defamation claim.  He also

28   sufficiently identifies *when* the statements were made.  He alleges that he generated the tokens at

13

issue on August 22, 2020, ICON announced the Revision 10 Proposal in the Medium Post on August 24, 2020, and, in the interim on or about August 23, 2020, ICON made its defamatory statements to the Exchanges, as reflected in the Medium Post. *See* Am. Compl. ¶¶ 5–9, 62–73, 76–85, 102.

With respect to *who* made statements to the Exchanges or *to whom* they were made, Shin simply states that ICON made the statements to the Exchanges, without distinguishing between the two Exchanges or pleading facts specific to communications with either one. His reliance on the sufficiently pleaded defamation claim in *Clougherty v. Lonsdale*, No. C 15-00382 WHA, 2015 WL 2062476 (N.D. Cal. Apr. 30, 2015) does not hold. The plaintiff in that case sufficiently laid out "who Clougherty made the allegedly defamatory statements to (the former girlfriend, the former girlfriend's current boyfriend, and the Stanford professor), the general timeline of when Lonsdale learned of the defamatory statements (after February 2014), and the content of the allegedly defamatory statements (that Lonsdale had sexually assaulted Clougherty)." *Id.* at *2. While Shin has pleaded the substance of ICON's statements and when they were made, he has not specifically alleged, unlike the plaintiff in *Lonsdale*, who made the statements and to whom the statements were made. *See id.* (distinguishing *PAI Corp.*, 2007 WL 1229329, at *9, because "Lonsdale, in contrast, has alleged who made the statements (Clougherty), generally when they were made, and to whom they were made"). He does not cite any case law that would support finding his *who* and *to whom* allegations sufficient at the pleadings stage. *See MacKinnon v. Logitech Inc.*, No. 15-CV-05231-TEH, 2016 WL 541068, at *5 (N.D. Cal. Feb. 11, 2016) (finding "fail[ure] to identify who made any of the alleged statements, when they were made, or to whom they were made" was "fatal to [plaintiff's] defamation claim").

Given the pleading deficiencies discussed above, ICON's motion to dismiss the defamation claim is GRANTED with leave to amend.

## B.  Anti-SLAPP Motion

The purpose of the anti-SLAPP statute is "to allow early dismissal of meritless first amendment cases aimed at chilling expression," but the Ninth Circuit has ruled that "granting a defendant's anti-SLAPP motion to strike a plaintiff's initial complaint without granting the

United States District Court
Northern District of California

14

1   plaintiff leave to amend would directly collide with [Federal Rule of Civil Procedure's] 15(a)'s

2   policy favoring liberal amendment." *Verizon Del., Inc. v. Covad Communs. Co.*, 377 F.3d 1081,

3   1091 (9th Cir. 2004).  Shin has amended his complaint once as a matter of course pursuant to Rule

4   15(a)(1)(B), *see* Dkt. No. 31, but this is the first time I am ruling on the sufficiency of his

5   pleading.  Because it is not clear that leave to amend would be futile, striking his defamation claim

6   "would 'directly collide' with Rule 15's liberal amendment policy." *Ramachandran v. City of Los

7   Altos*, 359 F. Supp. 3d 801, 820 (N.D. Cal. 2019).

8        Given my ruling on ICON's motion to dismiss, I will not reach the motion to strike the

9   defamation claim at this stage.  ICON's anti-SLAPP motion and request for fees is DENIED

10   without prejudice.  ICON may renew its motion in response to any amended complaint.  *See

11   Wynn*, 75 F. Supp. 3d at 1231 n.1 (N.D. Cal. 2014) (declining to address merits of defendant's

12   anti-SLAPP motion because defamation claim was dismissed with leave to amend, but permitting

13   defendant to re-raise anti-SLAPP arguments); *Art of Living Found. v. Does*, No. 10-CV-05022-

14   LHK, 2011 WL 2441898, at *9 (N.D. Cal. Jun. 15, 2011) (same); *Version2 Tech., Inc. v. NeilMed

15   Pharms., Inc.*, No. 16-cv-04720-LB, 2016 WL 6611015, at *8 (N.D. Cal. Nov. 9, 2016) (same).[2]

16   ## II.   CONVERSION

17        "Conversion is the wrongful exercise of dominion over the property of another." *Oakdale

18   Village Group v. Fong*, 43 Cal. App. 4th 539, 543–544, (1996). The elements of a conversion are

19   the plaintiff's ownership or right to possession of the property at the time of the conversion; the

20   defendant's conversion by a wrongful act or disposition of property rights; and damages. *Id.*;

21   *Kremen v. Cohen*, 337 F.3d 1024, 1029 (9th Cir. 2003).  However, "[i]t is not necessary that there

22   be a manual taking of the property; it is only necessary to show an assumption of control or

23

24   [2] To avoid further briefing on the matter, I make a note about whether a Rule 12(b)(6) or a Rule 56

25   standard would apply to ICON's anti-SLAPP motion.  In its current motion, ICON contends that because it challenges the factual sufficiency, not the legal pleading sufficiency of Shin's

26   defamation claim, a Rule 56 standard should apply.  ICON's motion to strike, however, largely mirrors its motion to dismiss, which raises a legal sufficiency challenge subject to a Rule 12(b)(6)

27   standard. *Compare* MTD 18–21 *with* Mot. Strike 8–11.  Even if ICON's motion to strike raises a factual sufficiency challenge, "discovery must be allowed, with opportunities to supplement evidence based on the factual challenges, before any decision is made by the court." *Planned

28   Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir.), *amended,* 897 F.3d 1224 (9th Cir. 2018).

United States District Court
Northern District of California

United States District Court
Northern District of California

1   ownership over the property, or that the alleged converter has applied the property to his own use."

2   *Oakdale*, 43 Cal. App. 4th at 544.

3        Shin frames the elements of conversion slightly differently based on the California Civil

4   Jury Instructions.  *See Ox Labs, Inc. v. Bitpay, Inc.*, No. CV 18-5934-MWF (KSX), 2020 WL

5   1039012, at *1 (C.D. Cal. Jan. 24, 2020) ("Plaintiff must prove the following five factual elements

6   to establish a conversion claim: (1) that the plaintiff owned, possessed, or had a right to possess

7   the property; (2) that the defendant substantially interfered with the plaintiff's property by

8   knowingly or intentionally taking possession of the property or refusing to return them after the

9   plaintiff demanded its return; (3) that the plaintiff did not consent; (4) that the plaintiff was

10  harmed; and (5) that the defendant's conduct was a substantial factor in causing the plaintiff's

11  harm.") (citing California Civil Jury Instructions ("CACI") 2100 (2019)).  Under either iteration of

12  the standard, the main dispute here is whether Shin has alleged that ICON "substantially interfered

13  with [his] property by knowingly or intentionally taking possession of the property," which can be

14  in the form of "an assumption of control or ownership over the property."  *Oakdale*, 43 Cal. App.

15  4th at 544; *Ox Labs*, 2020 WL 1039012, at *1.[3]

16       Shin contends that ICON substantially interfered with his ICX tokens in his personal

17  digital wallet when ICON released the Revision 10 Proposal that "blacklist[ed]" those ICX tokens

18  and thus "effectively froze all of Shin's ICX tokens, including the ICX tokens he had previously

19  purchased."  Am. Compl. ¶¶ 85, 92, 122.  He alleges that the Revision 10 Proposal was "aimed at

20  interfering with and programmatically restricting all of [his] ICX," and thus the release of

21  Revision 10 qualifies as an assumption of control over his ICX tokens.  *Id.* ¶ 88; Oppo. 10.  He

22  analogizes the situation to a tenant whose landlord has locked him out of his apartment and denied

23  him access to personal property inside.  *See Price v. Hovsepian*, 114 Cal. App. 2d 385, 387 (1952)

24  ("[D]enial of access to their property in this fashion constituted a conversion.").

25

26  _____

27  [3] The parties agree that Shin is not required to allege that ICON applied the ICX tokens for its
    "own use" "so long as [he] shows an assumption of control or ownership of the property
    inconsistent with [his] possessory or ownership rights."  Cal. Civ. Prac. Torts § 15:8 (citing
28  *Susumu Igauye v. Howard*, 114 Cal. App. 2d 122, 126 (1952)).

United States District Court
Northern District of California

1    In response to ICON's argument that it is not the "responsible actor" for the Revision 10

2    release because only P-Reps can vote to determine when to update the code, Shin asserts that

3    ICON directly controlled more than 30% of the total stake weighted vote and also controlled

4    "ICX_Station", the second largest P-Rep measured by stake weighted at more than 13%.  Am.

5    Compl. ¶¶ 105 –06.  ICON points out that, even if it voted all of its 43% stake-weighted ICX in

6    favor of the Revision 10 Proposal, it still would not have been enacted without the votes of other

7    P-Reps because at least 15 of the 22 P-Reps and 67% of the stake-weighted ICX vote are required

8    for the passage of any software update proposal.  *Id.* ¶ 100.

9    I agree that this allegation alone would not be enough to plausibly allege ICON's de facto

10    control over the ICON Network.  But the Amended Complaint offers more.  In addition to alleging

11    ICON's control over "more than 43% of the stake weighted ICX vote share," Shin alleges that

12    ICON induced other P-Reps to vote in favor of the Revision 10 Proposal it drafted by only stating

13    that the proposal was aimed at "fixing a vulnerability" but not revealing that "it was also aimed at

14    interfering with and programmatically restricting all of Shin's ICX."  *Id.* ¶ 88.  At least one P-Rep

15    later publicly commented that "I personally think the actor (I don't think he was a hacker because

16    he didn't hack anything) should be able to keep the ICX and do as he pleases."  *Id.* ¶ 94.  It is

17    plausible that some P-Reps may have rejected the Revision 10 Proposal had they known that it

18    would interfere with Shin's access to his ICX.

19    By presenting the Revision 10 Proposal the way it did, Shin alleges that ICON was able to

20    achieve the 15 votes necessary to implement the proposal "within a timespan of *just 10 minutes*,"

21    when the "average network proposal takes approximately 10 hours."  *Id.* ¶¶ 108–09 (emphasis in

22    original); *see also id.* ¶¶ 108, 111 (alleging that P-Reps have "never rejected a network proposal

23    submitted by ICON," and that "the speed in which the Revision 10 Network Proposal was

24    implemented demonstrates that ICON coordinated with other P-Reps to direct and control their

25    vote, likely relying on defamatory statements about Shin").

26    Shin also cites several public statements made by ICON that "signal its control over the

27    Network Proposal approval process."  *Id.* ¶ 102.  For instance, after implementing the Revision 10

28    Proposal, ICON announced that "*we* were able to recover the majority of the stolen funds," and

1    during the implementation of a different July 2020 Network Proposal, ICON founder, Min Kim,

2    tweeted that ICON was responsible for the issue arising from the software update, stating "*we* take

3    full responsibility for this and cover any damage."  Am. Compl. ¶¶ 102–04 (emphasis added).

4    Taken together, these allegations plausibly establish that ICON had de facto control over the

5    network approval process, including approval of the Revision 10 Network Proposal.

6            What is not clearly alleged, however, is how the implementation of the Revision 10

7    Network Proposal impacted Shin's access to his ICX tokens.  ICON disputes that the release of the

8    Revision 10 Proposal can qualify as an "assumption of control" because Shin concedes that he still

9    has access to the ICX tokens in paragraph 87 of the Amended Complaint.

10           Shin alleges that it is "false that ICX recovered the majority of the funds" he generated

11   during the August 2020 incident because "[he] still has access, albeit restricted access, to the

12   majority of the 14 million ICX tokens he generated, despite ICON's unlawful attempts to prevent

13   him from accessing or using them."  Am. Compl. ¶ 87.  This allegation appears to contradict other

14   allegations in the Amended Complaint.  *See, e.g.*, *id.* ¶ 88 (ICON "restrict[ed] all of [his] ICX").

15   It is also not clear whether ICON restricted his access to only the 14 million ICX tokens generated

16   during the August 2020 incident or to all his ICX tokens, including ones he purchased prior to that

17   incident.  C*ompare id.* ¶ 9, 92  (alleging Revision 10 Proposal "targeted *all* of Shin's ICX tokens

18   and programmatically locked them from being used"; "Revision 10 Proposal released by the

19   ICON network effectively froze *all* of Shin's ICX tokens, including the ICX tokens he had

20   previously purchased") (emphasis added) *with id.* ¶¶ 87, 110 (alleging Revision 10 Proposal

21   restricted access to "the majority of the 14 million ICX tokens he generated"; ICON "effectively

22   [froze] 14 million ICX in the matter of minutes").  Shin fails to address these contradictions in his

23   opposition brief.  I will give him leave to amend to fix this deficiency and plausibly explain what

24   implementation of the Revision 10 Proposal did to his access of the ICX tokens, whether the

25   access to all or specifically the 14 million generated ICX tokens were impacted, and how the

26   restriction at issue in this case qualifies as an "assumption of control."

27           ICON's motion to dismiss the conversion claim is GRANTED with leave to amend.

28

United States District Court
Northern District of California

18

### III.   TRESPASS TO CHATTEL

To prevail on a claim for trespass to chattel, Shin must allege that ICON intentionally and without authorization interfered with his possessory interest in personal property and that such unauthorized use proximately resulted in damage to him.  *See In re Facebook Internet Tracking Litig.*, 263 F. Supp. 3d 836, 842 (N.D. Cal. 2017).  "Conduct that does not amount to a substantial interference with possession, but which consists of intermeddling with or use of another's personal property, is sufficient to establish a cause of action for trespass to chattel."  *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1070 (N.D. Cal. 2000).  ICON argues that, like the conversion claim, the trespass to chattel claim fails because Shin has not alleged that ICON exercised dominion over his property.[4]

Shin alleges that ICON's release of the Revision 10 Proposal and its efforts to implement the Revision 10 Proposal constitute "intermeddling with" his "use" of his "personal property," causing injury by precluding him from transferring, spending, or otherwise using the ICX tokens as designed on the ICON Network.  Oppo. 13; *see* Am. Compl. ¶ 127.  Although he has adequately alleged that ICON had "de facto control" over the network proposal approval process, particularly with respect to the implementation of the Revision 10 Proposal, he does not, as discussed above, plausibly explain what exactly the Revision 10 Proposal did and how that "intermeddled" with his "use" of his "personal property."  A trespass to chattel claim fails where the alleged property in dispute "remain[s] unaltered and available to Plaintiff."  *See 123 Los Robles LLC v. Metzler*, No. 2:17-CV-00392-RGK-SK, 2017 WL 10311210, at *5 (C.D. Cal. Aug. 14, 2017).

The trespass to chattel allegations in the Amended Complaint primarily focus on the

---

[4] ICON also argues, but drops in its reply brief, that the trespass to chattel should be dismissed because it is duplicative of the conversion claim.  MTD 17.  ICON's reliance *on J & J Sports Prods., Inc. v. Enciso-Chavez*, No. 6:17-CV-01430-MC, 2018 WL 5298146, at *4 (D. Or. Oct. 24, 2018) is misplaced because that case involved a default judgment ruling that would not allow a double recovery for both statutory and trespass claims.  At the pleading stage, Federal Rule of Civil Procedure 8(d) expressly permits a plaintiff to plead claims in the alternative.  *See* Fed. R. Civ. P 8(d); *see also Garcia v. City of King*, No. 5:16-CV-06712-EJD, 2017 WL 5194519, at *9 (N.D. Cal. Nov. 9, 2017) (allowing both trespass to chattel and conversion claims to proceed past pleadings stage); *Baggett v. Hewlett-Packard Co.*, 582 F. Supp. 2d 1261, 1270 (C.D. Cal. 2007) (same).

United States District Court
Northern District of California

1    Revision 10 Proposal and the restricted ICON wallet access.  In a passing argument made in his

2    opposition brief, Shin attempts to further base his trespass to chattel claim on the restricted access

3    to his exchange accounts on Kraken and Binance.  He contends that ICON's actions "were at least

4    a substantial factor in causing the exchanges to freeze his funds," and thus ICON is "liable for

5    Shin's harm for his inability to use his funds on the exchanges."  Oppo. 15.  To the extent that he

6    chooses to bring a trespass to chattel claim based on his frozen exchange accounts, he must

7    plausibly allege how ICON "intermeddled" with his access and use of the tokens in those

8    exchange accounts, particularly in light of ICON's argument that it does not have any "control"

9    over those accounts.

10       ICON's motion to dismiss the trespass to chattel claim is GRANTED with leave to amend.

11   **IV.   DECLARATORY RELIEF**

12       "Declaratory relief should be denied when it will neither serve a useful purpose in

13   clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief

14   from the uncertainty and controversy faced by the parties."  *United States v. Washington*, 759 F.2d

15   1353, 1356–1357 (9th Cir.1985).  "A claim for declaratory relief is unnecessary where an

16   adequate remedy exists under some other cause of action."  *Mangindin v. Washington Mut. Bank*,

17   637 F. Supp. 2d 700, 707 (N.D. Cal. 2009).  For example, in *Tech. & Intell. Prop. Strategies Grp.*

18   *PC v. Fthenakis*, No. C 11-2373 MEJ, 2011 WL 3501690, at *9 (N.D. Cal. Aug. 10, 2011), the

19   defendant brought a conversion counterclaim against his former employer, alleging that the

20   employer "wrongfully took his personal property, including a personal computer, a computer

21   monitor, software and various books, proprietary manuals, and personal files, and converted it to

22   their own use."  The defendant also brought a declaratory relief counterclaim, seeking a

23   declaration that he was "entitled to retain his own personal property, including books he owned

24   before his employment."  *Id.*  The court dismissed the declaratory relief counterclaim, finding it

25   "needlessly duplicative" because "the requested declarations are wholly dependent on the Court's

26   findings on his substantive claims" and the defendant "offer[ed] no reason to believe declaratory

27   judgment will resolve any issues aside from those already addressed by the substantive claims."

28   *Id.* at *10.

United States District Court
Northern District of California

1   Shin's declaratory relief claim is similarly "needlessly duplicative." He seeks a declaration

2   that "the ICX tokens issued on August 22, 2020, are his property and that he is entitled to exercise

3   his property interests in the ICX tokens that he had accumulated prior to that date, and in the other

4   types of tokens that he had acquired before and after that date." Am. Compl. ¶ 119. His disputed

5   ownership of the ICX tokens is an element of both his conversion and trespass to chattel claims

6   and is an issue that will be resolved in the adjudication of those claims.

7   Shin argues that no precedent requires him to have to explain to any third parties how a

8   judgment on his other claims establishes his ownership interest. Oppo. MTD 8. Even so, his

9   declaratory relief claim remains "needlessly duplicative" given the substantive claims in the

10   Amended Complaint. *See Vigdor v. Super Lucky Casino, Inc.*, No. 16-CV-05326-HSG, 2017 WL

11   2720218, at *8 (N.D. Cal. Jun. 23, 2017) ("A claim for declaratory relief is unnecessary where an

12   adequate remedy exists under some other cause of action"; "where a plaintiff has alleged a

13   substantive cause of action, a declaratory relief claim should not be used as a superfluous second

14   cause of action for the determination of identical issues subsumed within the first.") (citations

15   omitted)

16   ICON's motion to dismiss the declaratory relief claim as duplicative is GRANTED. Shin

17   has leave to amend the claim to the extent he can allege that his declaratory relief claim is

18   appropriate as a separate and independent cause of action.

19   **V.      PRIMA FACIE TORT**

20   Shin alleges that ICON has committed a "prima facie tort at least to the extent its conduct

21   does not give rise to other recognized tort." Am. Compl. ¶ 142. ICON moves to dismiss the claim

22   on the grounds that a prima facie tort is not a cognizable cause of action under California law. *See*

23   *Young v. City of Visalia*, 687 F. Supp. 2d 1155, 1165 (E.D. Cal. 2010) ("[T]he prima facie tort

24   doctrine is not intended to supplant traditional tort elements or traditional tort defenses," and that

25   "California courts have refused to extend it into areas of established tort liability" (quotation

26   marks and citation omitted)).

27   Shin contends that his prima facie tort claim is brought under Colorado law and, in contrast

28   to California courts, Colorado courts have not declined to recognize prima facie tort. Oppo. 21.

1    To support his "best prediction" that Colorado courts would sustain his claim of prima facie tort,

2    he argues that Colorado generally follows the Restatement (Second) of Torts and section 870 of

3    the Restatement recognizes a prima facie tort as a standalone claim.  *See* Restatement (Second) of

4    Torts § 870 (1979) ("[O]ne who intentionally causes injury to another is subject to liability to the

5    other for that injury, if his conduct is generally culpable and not justifiable under the

6    circumstances," and "this liability may be imposed although the actor's conduct does not come

7    within a traditional category of tort liability.").

8         Shin cites *Douglass v. Hartford Ins. Co.*, 602 F.2d 934, 936 (10th Cir. 1979), where the

9    Tenth Circuit, referring to the lower court's opinion, stated "Since Colorado recognizes prima

10   facie torts in other respects, I see no reason why they wouldn't recognize it here."  *Douglass* did

11   not address a claim for prima facie tort.  In deciding whether Colorado courts would recognize

12   "negligent entrustment" as an actionable tort, the Tenth Circuit used the Restatement, particularly

13   sections 308 and 316 on negligent entrustment, as a guiding legal principle to ultimately conclude

14   that Colorado courts would recognize such a claim.  *Douglass*, 602 F.2d at 936 –37.  *Douglass*

15   does not stand for the proposition that, as Shin suggests, Colorado recognizes all torts specified in

16   the Restatement, including section 870.

17        To the contrary, the case law indicates that Colorado adopts sections of the Restatement on

18   a case-by-case and section-by-section basis.  *See, e.g.*, *Redies v. Nationwide Mu. Ins. Co.*, 711 F.

19   Supp. 570, 574 (D. Colo. 1989) (considering whether to adopt section 766A of the Restatement

20   because Colorado had already adopted section 766B and therefore "it is likely that 766A would be

21   adopted by the Colorado courts in a case such as this"); *Casebolt v. Cowan*, 829 P.2d 352, 357

22   (Colo. 1992) ("In electing to utilize sections 308 and 390 of the Restatement to guide us in our

23   analysis, we follow a path already taken by a number of other states that have employed,

24   approved, or adopted those Restatement rules as part of their negligence jurisprudence.").  Shin

25   fails to cite any case that specifically adopted section 870 of the Restatement and recognized a

26   prima facie tort as a cognizable claim under Colorado law.  Notably, when considering the laws of

27   other states, the Tenth Circuit has declined to recognize a prima facie tort under section 870 as a

28

1    standalone claim.[5]

2         Absent caselaw that explicitly recognizes a prima facie tort claim under Colorado law, I

3    cannot conclude that Shin's claim is cognizable.  ICON's motion to dismiss the prima facie tort is

4    GRANTED with prejudice.

5    **VI.    PUNITIVE DAMAGES**

6         ICON moves to dismiss the claim for punitive damages that Shin seeks under his

7    conversion, trespass to chattel, and defamation claims and in his prayer for relief.  MTD 22.

8    Obviously, because I am dismissing all causes of action the punitive damages claim must be

9    dismissed as well.  But that is not the only defect with this claim.

10        In order to sustain a claim for punitive damages, a plaintiff must allege that the defendant

11   has acted with "oppression, fraud, or malice."  *California Spine & Neurosurgery Inst. v. Aetna*

12   *Life Ins. Co.*, No. CV 18-6829-DMG (KSX), 2019 WL 1878355, at *2 (C.D. Cal. Mar. 7, 2019)

13   (quoting Cal. Civ. Code § 3294(a)).  Malice is defined as "conduct which is intended by the

14   defendant to cause injury to the plaintiff or despicable conduct which is carried on by the

15   defendant with a willful and conscious disregard of the rights or safety of others."  Cal. Civ. Code

16   § 3294(c)(1).  Oppression means "despicable conduct that subjects a person to cruel and unjust

17   hardship in conscious disregard of that person's rights."  Cal. Civ. Code § 3294(c)(2).  Fraud is "an

18   intentional misrepresentation, deceit, or concealment of a material fact known to the defendant

19   with the intention on the part of the defendant of thereby depriving a person of property or legal

20   rights or otherwise causing injury."  Cal. Civ. Code § 3294(c)(3).

21        Shin asserts that ICON knowingly misrepresented the circumstances of his ownership of

22   the ICX tokens to the exchanges and P-Reps to assist it with its tortious conduct and that because

23   "ICON was aware that its misrepresentations were false and that their statements would result in

24   injury to Shin's property, they constitute malicious and fraudulent acts under California law."

25

26   _____
[5] *See, e.g.*, *Beren v. Ropfogel*, 24 F.3d 1226, 1230 (10th Cir. 1994) (rejecting use of the "catchall"
27   prima facie tort from section 870 where it was duplicative of Kansas's "interreference-with-
     inheritance" tort); *Est. of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 862 (10th Cir.
28   2005) ("We also reject for the same reason plaintiffs' argument that the Restatement (Second)
     Torts § 870 establishes the tort of spoliation in Oklahoma").

United States District Court
Northern District of California

1    Oppo. 24.  That assertion is not supported by the allegations made in the Amended Complaint.

2    The Amended Complaint only states that the statements ICON made to the Exchanges and in the

3    public Medium Post, asserting that Shin was a "malicious attacker" who had acquired "stolen"

4    funds, were false and that, in turn, the Exchanges froze his accounts and the P-Reps voted to

5    approve Revision 10 to block access to his ICON wallet.  Am. Compl. ¶¶ 80–81, 91.  It does not

6    adequately allege that ICON *knowingly* made such false statements or that it made any of the

7    "multiple misrepresentations" with malice and with knowledge that it would result in injury to

8    Shin's property.  *Id.* ¶ 87.  Allegations that "ICON did this deliberately to interfere with Shin's

9    ownership of both his ICX tokens all of the other crypto-assets he owned on those exchanges"  or

10   that "ICON fabricated and communicated both public and private false statements for the purpose

11   of encouraging, coercing, and ensuring support for its Revision 10 Proposal, which ICON

12   deliberately designed and intended to interfere with Shin's ICX tokens" are conclusory and do not

13   suffice.  *Id.* ¶¶ 82, 90.

14        Shin also fails to identify any officer, director, or managing agent who committed an act of

15   oppression, fraud, or malice.  "'[A] corporate entity cannot commit willful and malicious conduct;

16   instead, "the advance knowledge and conscious disregard, authorization, ratification or act of

17   oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the

18   corporation.'"  *Roper v. Big Heart Pet Brands, Inc.*, No. 119CV00406DADBAM, 2020 WL

19   7769819, at *16 (E.D. Cal. Dec. 30, 2020) (quoting *In re Yahoo! Inc. Customer Data Sec. Breach*

20   *Litig.*, 313 F. Supp. 3d 1113, 1148 (N.D. Cal. 2018)); *see also Taiwan Semiconductor Mfg. Co. v.*

21   *Tela Innovations, Inc.*, No. 14-CV-00362-BLF, 2014 WL 3705350, at *6 (N.D. Cal. July 24,

22   2014) ("[A] company simply cannot commit willful and malicious conduct–only an individual

23   can.").

24        Shin relies on the allegation that ICON Strategy and Communications Lead Ricky Dodds

25   contacted him via Twitter Direct Message and accused him of being a "malicious hacker" who

26   needed to return the allegedly stolen ICX tokens or else Dodds would contact "law enforcement."

27   Am. Compl. ¶ 96.  This single allegation is not enough.  Nor does it explain how the

28   communication between him and Dodds relates to the alleged "malicious conduct" underlying his

United States District Court
Northern District of California

24

1   punitive damages claim.  *See, e.g.*, *In re Yahoo*, 313 F. Supp. 3d at 1148 (finding punitive

2   damages claim sufficiently pleaded where plaintiffs "focus[ed] on particular conduct by the Chief

3   Information Security Officers ("CISOs"), including specific allegations that then-CISO found

4   "gaping holes in Yahoo's data security as early as 2014" and "knew about the 2014 Breach as it

5   was happening," but "took no specific actions in response," "mak[ing] plausible Plaintiff's claim

6   that high-ranking executives and managers at Yahoo, including its CISO, committed oppressive,

7   fraudulent, or malicious conduct") (internal quotation marks omitted)

8         ICON's motion to dismiss the punitive damages claim is GRANTED with leave to amend.

9                                    **CONCLUSION**

10        ICON's motion to dismiss is GRANTED with leave to amend, except with respect to

11   Shin's fifth cause of action for prima facie tort, which is dismissed with prejudice.  ICON's

12   motion to strike is DENIED without prejudice.  Shin has leave to amend within twenty (20) days

13   of this order.

14        **IT IS SO ORDERED.**

15   Dated: May 11, 2021

16

17                                    William H. Orrick
                                      United States District Judge
18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California