# EXHIBIT E

**U.S. Department of Justice**
Criminal Division
*Money Laundering and Asset Recovery Section*



# Asset Forfeiture Policy Manual    2021

International Emergency Economic Powers Act (IEEPA)[24] or the Trading with the Enemy Act[25] or related conspiracies, schemes or other federal offenses.[26] For criminal matters, all funds and the net proceeds from the sale of the property from these violations must be deposited into the USVSST Fund; for civil cases, 75% of the proceeds must be deposited.[27] Prosecutors must consult MLARS as early as possible in any case that involves a state sponsor of terrorism and may require deposits to the USVSST Fund.

### E. Quick release

#### E.1 Before filing of any claim

Certain property may be released following federal seizure for forfeiture but prior to the filing of any claim pursuant to 28 C.F.R. § 8.7 ("quick release"). This may include property that does not meet asset-specific net equity thresholds (*see* Section I.D.1 in this chapter), property the seizing agency decides not to forfeit after post-seizure analysis (*see* Sections I.D.3 and I.D.4 in this chapter), property belonging to an innocent owner having an immediate right to possession, or other property the release of which serves to promote the best interests of justice or the government (28 C.F.R. § 8.7(b)). While these issues ideally should be resolved in seizure planning (*see* Section I.C.2 in this chapter), agencies may use post-seizure quick release whenever warranted.

When a seizing agency elects to use quick release, determining the appropriate party to whom the property should be released will depend on the nature of the seized property and the particular circumstances. If there is no registered owner of the property to be released, e.g. currency, it usually should be returned to the person from whom it was seized.[28] If there is a registered owner of the property, such as an automobile, the property should usually be returned to that party, regardless of whether there is a lien or other third party interest with ownership rights to the property. However, if a third party, such as a lienholder, has asserted its contractual rights in a judicial proceeding, obtained a final judgment, and provided satisfactory proof of the judgment and its ownership interest and right to immediate possession of the property, the seizing agency may return the property to that third party instead of the registered owner. Similarly, if a state court authorizes a state or local law enforcement agency to take possession of the seized property, the seizing agency may release the property in accordance with that court order. If the seizing agency is aware of a third party with an ownership interest in the property, regardless of whether it has asserted any contractual rights to immediate possession, it may notify the third party of the release in advance of releasing the asset to the registered owner.

#### E.2 Declination

There may be instances in which a prosecutor declines to proceed with a judicial forfeiture after a claim has been filed in an administrative forfeiture proceeding. Once that decision is made and the federal government no longer has a legal basis for holding the seized property (i.e. it is not evidence

---

[24] Pub. L. 95-223, Title II, § 202, Dec. 28, 1977, 91 Stat. 1626.

[25] Pub. L. 65–91, Oct. 6, 1917, ch. 106, § 1, 40 Stat. 411.

[26] *See* 34 U.S.C. § 20144(e)(2)(A).

[27] For more information about the USVSST Fund, visit MLARS' USVSST page.

[28] In most cases, however, release of funds will be subject to the Treasury Offset Program (TOP). *See also* Chap. 11, Sec. I.B.9 in this *Manual*.

of a violation of law), the agency that seized the property must return it to the appropriate party, initiate abandonment proceedings pursuant to 28 C.F.R. § 8.10(e), or otherwise dispose of it in accordance with law. In determining the appropriate party to whom to return the seized property, the seizing agency should follow the same guidance for the return of property pursuant to quick release, including providing prompt notification to the appropriate party.

## II.   Pre-seizure Judicial Review

Pre-seizure judicial authorization of property seizures serves multiple purposes, including:

- allowing neutral and detached judicial officers to review the basis for seizures before they occur;
- enhancing protection for Department officers against potential civil suits claiming wrongful seizures; and
- reducing the potential that the public will perceive property seizures to be arbitrary and capricious.

Whenever practicable, Department officials should obtain ex parte judicial approval by, for example, obtaining a seizure warrant, before seizing personal property.

to $250,000 per person per account. Interest may be paid at regular intervals or all at once at maturity. Higher interest is available for larger deposits or longer maturity dates. A penalty usually applies for early withdrawal of the funds, but no-penalty CDs are available at an extremely low interest rate. Because there are no licensing or registration requirements, brokerage firms and independent salespersons may issue CDs, which may or may not be FDIC or NCUA-insured.

### A.2   Seizing procedures

Particularly because Certificates of Deposit (CDs) are so variable, the seizing agency should immediately notify the issuer of the CD that it has been seized or restrained for forfeiture. The agency should instruct the issuer to take the steps necessary to freeze the principal and accrued interest covered by the CD so it will be negotiable by the USMS after forfeiture. Most CDs issued today are not evidenced by a paper certificate; they are simply an electronic bookkeeping entry.

### A.3   Disposition

The USMS will take appropriate action, in accordance with established procedures, to liquidate the CDs after forfeiture.

## B.   Cryptocurrency

### B.1   Overview

Cryptocurrency, a type of virtual currency, is a decentralized, peer-to peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services, or exchanged for fiat currency or other cryptocurrencies.[19] Individuals can obtain cryptocurrency through exchanges and other intermediaries, person–to-person transfers, the sale of goods or services, or mining.[20]

Cryptocurrency uses cryptography to secure and authenticate transactions and to manage and control the creation of new currency units. There are thousands of cryptocurrencies, including Bitcoin, Litecoin, and Ether. Generally, cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Most cryptocurrencies have a "blockchain," which is a decentralized, typically public, transaction ledger containing an immutable and historical record of every transaction involving the cryptocurrency. Using open source or subscription analytical tools, cryptocurrency transactions can often be traced in their blockchains. However, some cryptocurrencies operate on blockchains that are not transparent or have built in protocols designed to conceal transactional information, making it difficult to trace or attribute transactions.

---

[19]  Virtual currency is distinguished from fiat currency, which is the coin and paper money of a country that has legal tender.

[20]  An individual can "mine" bitcoins by using computing power to solve a complicated cryptographic function and verify and record payments on the blockchain. Individuals are rewarded for this task by receiving newly created units of a cryptocurrency.

Financial Crimes Enforcement Network (FinCEN) Guidance issued on March 18, 2013 (FIN-2013-G001),[21] and May 9, 2019 (FIN-2019-G001),[22] states that convertible virtual currency administrators and exchangers, including kiosk operators and individual exchangers operating as a business, are regulated as money services businesses (MSBs).[23]

Cryptocurrency is associated with a type of account called a **wallet**. A wallet is a software program that interfaces with the blockchain and generates and stores public and private keys used to send and receive cryptocurrency. A public address, which is represented as a case-sensitive string of letters and numbers, is akin to a bank account number, and a private key is a cryptographic equivalent of a Personal Identification Number (PIN) or password. To access and transfer value associated with a public key or address on a blockchain, an individual must use the public key or address and its unique corresponding private key. The value lies in the private key because whoever controls the private key controls any value associated with the corresponding cryptocurrency public address. While private keys are initially generated by a user's wallet software, they can be copied and stored in myriad locations, described further below.

Cryptocurrency wallets exist in several forms, and users may store public and private keypairs either locally or remotely. Additionally, wallets may be *custodial* (also known as *hosted*)—where the wallet provider, as opposed to the owner of the cryptocurrency, keeps custody of the public and private keys on the wallet owner's behalf—or *non-custodial* (also known as or *un-hosted* or *self-hosted*)—where the wallet owner has sole access to the private keys. Where the keys are stored and who can access the keys will determine where and to whom agents can effectuate service of a seizure warrant.

**Wallet types include:**

- **Paper wallets** (locally stored, self-hosted/non-custodial):
    - An alphanumeric string or list (or other physical representation, such as a QR code) of public and private keypairs stored on a piece of paper. The user needs to connect a device to the internet, import the keys, and use wallet software to conduct transactions.

- **Hardware wallets** (locally stored, self-hosted/non-custodial):
    - A physical, electronic device that stores the public and private keypair on the device. Some hardware wallets have additional offerings, such as security features (e.g. login credential requirements), the ability to display the remaining balance in a wallet, and internet connectivity so that a hardware wallet owner can conduct cryptocurrency transactions.

---

[21] FIN-2013-G001: Application of FinCEN's Regulations to Person Administering, Exchanging, or Using Virtual Currencies (Mar. 18, 2013).

[22] FIN-2019-G001: Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies (May 9, 2019).

[23] *See* FIN-2013-G001 and FIN-2019-G001.

- **Software wallets** (locally stored, self-hosted/non-custodial):

  - Software installed on a user's electronic device (e.g. computer, server, and mobile phone), which stores the wallet and private keys on the device and enables the internet-connected user to conduct cryptocurrency transactions from the device. (Although software wallets store the public and private keypair on a device, some software permits the user to remotely access the device and keys.)

- **Web-based wallets** (remotely stored, custodial and non-custodial):

  - Third party owned, cloud-based software that users can log into using a username and password. The third party software provider stores the public and private keypair on its cloud on the account holder's behalf. Once logged in, the user can see their keys and can transact in cryptocurrency from the online wallet. In some instances, the keys are stored on the software provider's servers in an encrypted state such that only the user (not the software provider) can access them after entering their username and password.

### B.2   Seizing procedures

#### B.2.a   Agency/U.S. Marshals Service (USMS) wallets

Each seizing agency should have a wallet or address for temporary storage of seized cryptocurrency prior to the transfer of custody to the USMS or USMS contractor. Agencies typically set up one or more wallets for each seizure. After seizing cryptocurrency, processing the seized cryptocurrency through the seizing agency's Asset Forfeiture department, and assigning a CATS identification number, the seizing agency should then transfer the cryptocurrency for pre-forfeiture storage according to current USMS Complex Assets Unit (CAU) procedures.

#### B.2.b   Seizure of cryptocurrency

Unless authorized by a search warrant or consented to by the owner, a seizure warrant should be obtained for the seizure of cryptocurrency.[24] In the case of cryptocurrency held in a locally stored wallet in the United States, the seizing agency should obtain a seizure warrant for that cryptocurrency possessed and controlled by the owner and serve the warrant on the owner or the owner's counsel. In the case of cryptocurrency held in an account or wallet hosted by a U.S.-based service provider, such as an institutional exchange, the seizing agency should obtain and serve a seizure warrant on the service provider, similar to executing a seizure warrant on a bank account.

Many cryptocurrency service providers are located outside the United States. Prosecutors should consult the Office of International Affairs (OIA) regarding seizure of cryptocurrency from foreign-located service providers, even in cases where a wallet company does not itself have access to or control of the private key. Generally, such seizures will require use of a mutual legal assistance treaty (MLAT) request or other similar authority. *See* Chapter 8 in this *Manual* for a discussion of policies relating to international seizures and forfeitures. Prosecutors should consult OIA regarding the seizure of cryptocurrency from foreign-located service providers, such as institutional exchanges. Some exchanges located outside the United States might have U.S. offices or points of contact and will

---

[24] In many cases, the seizure of cryptocurrency associated with a locally stored wallet may be authorized by a Federal Rule of Criminal Procedure 41 search and seizure warrant issued for a premises or electronic device where a wallet and private keys are located.

accept service of U.S. seizure warrants; however, prosecutors and agents should seek the voluntary restraint of foreign-located assets only through U.S. points of contact. Prosecutors should not agree to accept any cryptocurrency from a foreign-located company without an MLAT or permission from OIA, even if the company offers to transfer the assets voluntarily. Doing so without an MLAT or permission from OIA could violate the sovereignty of another country. Contact MLARS for examples of warrants for cryptocurrency.

Prosecutors and agents should be aware that there may be multiple copies of a private key for a particular asset. Thus, it is imperative that once authorization to seize the virtual currency is obtained, it be transferred to an agency-controlled wallet. This will not only preserve the cryptocurrency for forfeiture but will also preserve the jurisdiction of the court in a civil forfeiture case, because in rem jurisdiction is premised upon the court's control of the asset. All seized cryptocurrency should be held in "cold storage," i.e. in a secure offline device, until it is transferred to a designated government-controlled custodial wallet, per current USMS procedures.

If the seizing agency has difficulty accessing the cryptocurrency for seizure, it should work with the owner or contact the Computer Crime and Intellectual Property Section (CCIPS) for assistance.

### B.3   Disposition

Because of the risks that early conversion may pose, in most cases, cryptocurrency should be kept in the form it was seized and not liquidated (i.e. converted to fiat currency or other cryptocurrency) until a final order of forfeiture is entered or an administrative forfeiture is final. Agencies or prosecutors may, however, seek an order for the interlocutory sale of cryptocurrency at the request or with consent of all parties with an ownership interest in the asset, or in certain cases involving victims who suffered pecuniary losses. Prosecutors must consult with MLARS before any pre-forfeiture conversion and before seeking an order for interlocutory sale of cryptocurrency.

Any liquidation of cryptocurrency should be executed according to established written policies of the seizing agency and the USMS. Prosecutors may contact MLARS or USMS' headquarters Asset Forfeiture Division (AFD) for guidance regarding disposition of any alternative cryptocurrencies (e.g. cryptocurrency other than Bitcoin), including anonymity enhanced cryptocurrencies (commonly referred to as privacy coins) and tokens. Permission to sell privacy coins or to place them into official use must be obtained from MLARS.

### C.   Employee Retirement Income Security Act (ERISA) accounts

Defendants frequently hold retirement accounts that may be subject to forfeiture, either directly or as substitute property. Even when not subject to policy limitations or approval requirements, prosecutors should be aware that there may be legal limitations on the forfeiture of retirement accounts. Certain employee pension benefit or deferred compensation plans are governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461 et seq. Section 1056(d)(1) of ERISA provides that "[each] pension plan shall provide that benefits provided under the plan may not be assigned or alienated." Few courts have addressed whether this anti-alienation provision precludes the forfeiture of funds in retirement plans covered by ERISA, but those few courts have generally held that ERISA's anti-alienation provision does preclude forfeiture of funds in ERISA-protected retirement plans. *See United States v. Funds ex rel. Weiss*, 345 F.3d 49, 56–57 (2d Cir. 2003) (ERISA